Sue Ellen Wooldridge
Assistant Attorney General

Thomas E. Moss
United States Attorney

Donna S. Fitzgerald (Connecticut Bar #411810) (Donna.Fitzgerald@usdoj.gov)
Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 663
Washington D.C. 20044-0663
Phone: 202-305-0476
Fax: 202-305-0506

Courtney Taylor, DC Bar # 475594
Trial Attorney
Wildlife and Marine Resources Section
Environment & Natural Resources Division
United States Department of Justice
Ben Franklin Station, P.O. Box 7369
Washington, D.C. 20044-7369
Tel: (202) 353-7548
Fax: (202) 305-0275
courtney.taylor@usdoj.gov

Deborah Ferguson
Assistant United States Attorney
United States Attorney's Office for the District of Idaho
800 Park Blvd., Suite 600
Boise ID 83712
Tel: 208-334-1211
Fax: 208-334-9375

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| WESTERN WATERSHEDS PROJECTS, | ) | Civ. No. 05-297-E-BLW |
| | ) | |
| Plaintiff, | ) | Combined Response in Opposition |
| | ) | to Motion for Injunction re: |
| v. | ) | NEPA and ESA Violations and |
| | ) | In Support of Motion to Dismiss |
| JOE KRAAYENBRINK, et al. | ) | |

)<br>
Defendants.   )<br>
)

## I. INTRODUCTION

Plaintiff Western Watersheds Project seeks an immediate injunction on a Final Rule, published on July 12, 2006 and effective August 11, 2006, which was designed to address discrete issues that had arisen in grazing administration since issuance of the previous regulations in 1995.

A preliminary injunction is an extraordinary remedy, and plaintiff has the burden to prove by clear and convincing evidence that the remedy is appropriate.  Granny Goose Foods, Inc. v. Teamsters, 415 U.S. 423, 442 (1974).  In this case, plaintiff has not only failed to meet its burden, it has not even offered a legitimate reason for this Court to issue a preliminary injunction pending its review of plaintiff's claims.  First, a preliminary injunction is not needed because there is no irreparable harm which arises from the regulations becoming effective.  The new regulations are administrative changes that do not by themselves create any change in the use or management of rangelands.   The regulations do not mandate any management decisions or even establish specific standards or guidelines for the management of allotments – any on-the-ground impacts will arise only from future agency decisions.  Accordingly, plaintiff cannot and has not demonstrated any immediate irreparable harm that would justify the issuance of a preliminary injunction.

In addition, plaintiff has failed to demonstrate a likelihood of success on the merits of either its Endangered Species Act ("ESA") or National Environmental Policy Act ("NEPA")

challenges.[1/]  The ESA claims were filed without the jurisdictionally required notice, and in any event the claims are without merit because the Bureau of Land Management (BLM) properly concluded that the new regulations, which are administrative in nature, could and would have no effect on protected species.  The NEPA claims are also without merit – being based on misconceptions of the new regulations and a misguided attempt to flyspeck the Environmental Impact Statement instead of properly looking at the document as a whole.

In short, plaintiff has failed to establish any of the elements needed to justify the issuance of a preliminary injunction.  Its motion should be denied.

## II.  FACTUAL BACKGROUND

### A.  HISTORY

BLM administers livestock grazing on public lands within the continental United States under the regulations at 43 C.F.R. Part 4100.  The primary laws that govern grazing on public land are the Taylor Grazing Act ("TGA") of 1934, 43 U.S.C. § 315, the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. § 1700 et seq., and the Public Rangelands Improvement Act of 1978, ("PRIA"), 43 U.S.C. § 1901 et seq.  BLM maintains corresponding regulations in its grazing program.  43 C.F.R. Part 4100.

The last major revision of BLM's regulations was in February, 1995, when BLM published comprehensive changes.  The 1995 regulations, also known as "Rangeland Reform '94" were a "stated effort to 'accelerate restoration' of the range, make the rangeland management program 'more compatible with ecosystem management,' 'streamline certain

---

[1/]Plaintiff filed two separate motions for a preliminary injunction, a 40 page brief addressing alleged NEPA violations, and a 22 page brief alleging ESA violations.  Defendants respond to both motions in this consolidated response brief.

3

administrative functions,' and 'obtain for the public fair and reasonable compensation for the grazing of livestock on public lands.'" <u>Public Lands Council v. Babbitt</u>, 529 U.S. 728 (1995) (discussing 58 Fed Reg. 43,208 (1993) (Proposed Rule)).

Major changes made by the 1995 regulations included: revision of the definition of grazing preference, addition of a requirement that applicants for a new or renewed permit have a satisfactory record of performance, imposition of surcharges for subleasing, creation of conservation use permits [subsequently found invalid]; provision that the United States, if allowed by state water laws, would acquire livestock water rights on public lands, establishment of the fundamentals and standards and guidelines, creation of resource advisory councils, and changes to mandatory qualifications to allow individuals not in the livestock business to qualify to hold permits or leases.  Final EIS ("FEIS") at 1-8 - 1-9.[2/]  In addition, the 1995 regulations expanded interested public participation.  Final Rule, 71 Fed. Reg. 39,402 (July 12, 2006).

The July 12, 2006 rule at issue here refines selected provisions of the 1995 regulations but leaves largely intact the significant changes put in place in 1995.  The impetus for BLM's current rulemaking was discrete issues and concerns that came to BLM's attention through implementation experience since 1995, and from public comments.  FEIS at 1-13, 2-5.  The changes are designed to be narrow in scope, they do not change the grazing fees or the substance of the fundamentals of rangeland health or the standards and guidelines for grazing administration, and otherwise leave the 1995 regulatory changes in place.  <u>Id</u>.

BLM explained that even though the agency viewed the changes as refinements to the

_____

[2/]Like plaintiff, defendants cite to the Final EIS, the Errata, and the Addendum issued by BLM. These documents are available on BLM's website at <u>www.blm.gov.</u>

reforms made in 1995 and did not anticipate that the proposed changes would have significant environmental effects, the agency recognized "that even small changes in the management of public lands can generate a high level of interest."  FEIS, Executive Summary ("ES") at 1. Given this high level of interest, BLM decided to prepare an EIS to, among other things, "provide a means for public discussion."  Id.

## B.  DEVELOPMENT OF 2006 CHANGES TO GRAZING REGULATIONS

BLM has developed the 2006 regulation changes with substantial public involvement.  In March, 2003, BLM published an Advance Notice of Proposed Rulemaking and a Notice of Intent to prepare an EIS.  BLM explained that the purpose of the proposed rulemaking was to amend certain provisions of the grazing regulations which had been promulgated in 1995.  BLM held four public scoping meetings in March, 2003, and on the basis of the more than 8,300 comments received, developed and published a Proposed Rule on December 8, 2003.  FEIS, ES-1.  BLM also issued a draft environmental impact statement (DEIS), and published a notice of its availability in the Federal Register on January 2, 2004.  Id.

BLM held six public meetings in late January and early February, 2004 to take comments on the Proposed Rule and the Draft EIS.  Id.  The comment period for both the Proposed Rule and the DEIS closed on March 2, 2004.  Id.  BLM received more than 18,000 comments, and some, including those from the United States Fish and Wildlife Service ("FWS"), were received after the close of the comment period.  Id.  BLM completed the final EIS ("FEIS") in October, 2004, but did not release it until June, 2005.  At that time, BLM also issued a "Revisions and Errata" sheet which made a number of revisions and corrections to the FEIS, and noted that "[d]ue to delay in final clearance, the EIS was not cleared for release until June, 2005."

As explained in the FEIS, the purpose and need for the grazing regulation was to address a variety of "discrete issues" regarding the administration of grazing management in the nine years since the promulgation of the 1995 regulations.  FEIS at 1-13.  The FEIS further explained that the rulemaking was "relatively narrow in scope," and that the purpose was not to change the fundamental structure of the regulations.  Id. at 1-13, 2-5.  The FEIS discussed three alternatives in detail, and analyzed the environmental consequences associated with each alternative, including impacts to wildlife, and also analyzed cumulative impacts.  FEIS at Chapters 2, 4.

Before BLM could issue a Record of Decision ("ROD") and the final regulation, plaintiff Western Watersheds Project filed a complaint and a motion for a preliminary injunction in the United States District Court for the District of Idaho, challenging the issuance of the Final Rule under theNEPA, 43 U.S.C. § 4321 et seq., the ESA, 16 U.S.C. § 1531, FLPMA, the TGA, and the PRIA.  The motion asked the Court to preliminarily enjoin the implementation of the final rules.  Plaintiff subsequently withdrew its Complaint and its motion, recognizing that because BLM did not issue a ROD, no judicially-reviewable final agency action had occurred.

On March 31, 2006, BLM issued an "Addendum" to its FEIS which explained that the Addendum was prepared: 1) to more thoroughly respond to some of the comments received on the DEIS; 2) to respond to comments that were submitted after the close of the comment period on March 2, 2004; and 3) to "[f]urther clarify certain issues and administrative changes to the grazing regulations as already discussed within the Final EIS."  Approximately 28 pages of the 46-page Addendum contain BLM's responses to comments submitted on the DEIS, including the late comments submitted by the U.S. Fish and Wildlife Service.  The Addendum also clarifies BLM's analysis of impacts associated with the change in the "[t]ime-frame for taking action to

meet Rangeland Health standards," and clarifies its earlier discussion of the environmental

consequences associated with all of the alternatives analyzed, including cumulative impacts.  On

July 12, 2006, BLM issued its final rule and ROD.  Final Rule, 71 Fed. Reg. 39, 402 (July 12,

2006).

### C.  CHANGES MADE BY THE FINAL RULE

The following explanation of the changes made by the 2006 rule provide background

context for this Court regarding the changes made by the Final Rule.  In the Argument Section

below, we address in greater detail plaintiff's mischaracterization of the Final Rule and

exaggeration of its effects.

### 1.  Change to Public Participation

The Final Rule made two changes to the public participation process.  First, BLM

modified the definition of "interested public" in 43 C.F.R. §§ 4100.0-5 (definitions), 4110.2-4

(allotments), 4110.3-3 (implementing changes in active use), 4130.2 (grazing permits and

leases), 4130.3-3 (modification of permits or leases), and 4130.6-2 (non-renewable grazing

permits and leases) to ensure that only those individuals and organizations who actually took

advantage of public review opportunities remained on the list of interested publics.  71 Fed. Reg.

at 39,404.  Second, BLM eliminated the requirement to "consult, coordinate, and cooperate"

("CCC") with the interested public in certain day-to-day operational aspects of the grazing

program.  43 C.F.R. § 4130.3-3; Addendum at 37.

The earlier 1995 regulations established for the first time that any person or group could

maintain interested public status simply by requesting that status in writing for a specific

allotment or by submitting a written comment on the management of livestock grazing on a

specific allotment.  71 Fed. Reg. at 39,414.  BLM was then obligated to both mail, at government

expense, documents related to decisions on a particular allotment, and to consult, cooperate, and

coordinate ("CCC") with members of the interested public on a host of decisions.  <u>Id</u>.  <u>See also</u>

FEIS at 5-95 (noting that BLM has devoted substantial resources and taxpayer dollars to

maintaining mailing lists that include groups and individuals that have not participated in

allotment management decisions for years).

BLM found that some of the "interested public" participated rarely, if at all, in the

decision-making, and yet, BLM was still obligated to devote substantial clerical time and money

to maintaining mailing lists and mailing documents to these persons and groups.  71 Fed. Reg. at

39,414.  BLM also found that the consultation requirements were unnecessarily duplicative at

times, such as when BLM was obligated to consult on both the formulation of a grazing decision

and then its implementation, and would slow BLM's ability to act promptly to respond to

changing range conditions or transitory management circumstances.  <u>Id</u>.; <u>see also</u> Declaration of

Kenneth Visser (hereafter, "Visser Decl") (attached hereto as Exh. 1) at ¶ 8.

Consequently, the final rule has amended the definition of "interested public" so that one

must actually participate in the decision-making process in order to maintain interested public

status, and the rule no longer requires BLM to consult, cooperate, and coordinate on the

following decisions: 1) adjustments to allotment boundaries (43 C.F.R. § 4110.2-4); 2) changes

in active use (43 C.F.R. § 4110.3-3(a)); 3) emergency allotment closures ( 43 C.F.R. § 4110.3-

3(b)); 4) issuance or renewal of individual permits or leases (43 C.F.R. § 4130.2(b)); and 5)

issuance of nonrenewable grazing permits and leases (43 C.F.R. § 4130.6-2).   71 Fed. Reg. at

39,414.

By eliminating the requirement to consult, cooperate, and coordinate on these decisions, BLM is attempting to balance the legitimate need for public involvement in the management of public lands with the public interest in cost-effective management of those lands.  FEIS at 5-95. BLM makes thousands of these day-to-day decisions annually, but these routine matters are guided by broader decisions, such as allotment management plans and monitoring and other reports, which the interested public will continue to have an opportunity to review and provide input.  71 Fed. Reg. at 39,414.  Moreover, the rule does not affect the public participation opportunities available through the NEPA environmental analysis process.  71 Fed. Reg. at 39,415.  BLM expects the changes in the definition and role of the interested public to improve administrative efficiency and lead to more timely decision-making, which, in turn, will benefit overall rangeland health.  Id.  BLM has found that the multiple layer consultation requirement can slow BLM's ability to act promptly to further restoration goals and to respond quickly to changing range conditions.  Visser Decl. at ¶ 8 (citing 71 Fed. Reg. at 39, 414).

As BLM has explained throughout the rulemaking process, the amended regulation retains opportunities for the interested public to participate and provide input to BLM in various decisions related to grazing and management of the range.  Public involvement starts with the development of a land use plan, which determines what public lands are available for livestock use.  43 C.F.R. § 1610.2.  The amended regulation specifically retains the "CCC" requirement to involve the interested public in BLM decisions that apportion additional forage; develop or modify allotment management plans or grazing activity plans; plan range development or improvement programs; and develop grazing management evaluation reports.  FEIS 2-24. Public participation in such broad-level management decisions ensures that the interested public

can continue to monitor and provide input on BLM grazing decisions.  FEIS 2-24 - 2-25.

Moreover, there is nothing in the amended regulation that would preclude BLM from using its

discretion to consult with a member of the interested public for any decision if such consultation

would be valuable.  Id. at 2-25.

### 2. The Fundamentals of Rangeland Health

With respect to the fundamentals of rangeland health, the amended regulations make four

changes that plaintiff challenges.  First, the final rule eliminates the existing requirement in 43

C.F.R. § 4180.1 to take "appropriate action" when BLM determines that the fundamentals are

not being met.  However, the final rule retains the requirement that BLM take "appropriate

action" when BLM determines that specific standards and guidelines are not being met.  As

BLM explained, this change reflects BLM's experience that because the Fundamentals are very

broad in nature, they are "inefficient and imprecise . . . [and] difficult to administer."  Addendum

at 3-4.[3]

The final rule also reflects BLM's experience that BLM has relied exclusively on

standards and guidelines for evaluating rangeland health and making changes to grazing permits

and leases.  Id. at 3.  This is because the standards and guidelines "describe more particularly the

biological and physical conditions that can be assessed to determine rangeland health and are

designed to guide the BLM in determining appropriate grazing management."  Id. at 2.  Thus, as

---

[3]The Fundamentals were promulgated in 1995.  43 C.F.R. Part 4180 (2000).  The fundamentals
are expressed in terms of maintaining or making significant progress toward achieving: 1)
properly functioning watersheds; 2) hydrologic and nutrient cycles and energy flow sufficient to
support healthy biotic communities; 3) water quality in compliance with state standards and
capable of meeting wildlife needs; and 4) habitats restored or maintained for special status
species.  43 C.F.R. §4180.1 (2000).

explained in the preamble to the final rule, the amended regulation achieves "a better reflection of the relationship between the fundamentals and the standards and guidelines." 71 Fed. Reg. at 39,412.

The second change that the final rule makes with respect to the fundamentals is the requirement in section 4180.2(c)(1) that BLM use existing or new monitoring data to identify whether existing grazing management practices or levels of grazing use are significant factors in failing to achieve standards and guidelines. As noted in the Revisions and Errata document dated June 17, 2005, and which accompanied release of the FEIS, compliance with the standards and guidelines provision of the rule will be a two-step process. First, a standards assessment will be used by the authorized officer to assess whether rangeland is failing to achieve standards or that management practices do not conform to guidelines. Errata at 3. If an assessment indicates failure to achieve standards or that management practices do not conform to guidelines, then BLM will use existing or new monitoring data to determine whether existing grazing management practices or levels of grazing use are significant factors in failing to achieve standards and conform with the guidelines. Id.

The third change, found at 4180.2(c)(1)(i), allows up to 24 months (or longer if necessary to accommodate legally-required processes of another agency) following a determination that grazing is a significant factor in failing to achieve standards and guidelines for BLM to formulate, propose, and analyze the appropriate action. 71 Fed. Reg. at 39,408. The existing regulations required BLM to take action no later than the start of the next grazing year. This rule change allows a more realistic timeframe for BLM to complete required analyses and consultations, and provides additional time to undertake needed collaboration. Moreover, the

11

Final Rule authorizes BLM to take action within a shorter time-frame when necessary.  43

C.F.R. § 4110.3-3(b)(1).

Finally, the Final Rule provides for a 5-year phase in of changes in active use greater

than 10 percent.  43 C.F.R. 4110.3-3(a)(1).  The existing rule does not specify the timeframe

within which BLM must implement such changes.  A phase-in period, as explained at 71 Fed.

Reg. at  39,408, would avoid the adverse impacts of sudden herd size reductions for permittees.

In addition, the phase-in period helps BLM work collaboratively with permittees to ensure that

appropriate changes are made in a timely manner.  Id.  As noted above, however, BLM retains

the authority to take action more quickly.  Id.

> **3.     Other Provisions Related to Grazing Boards; Grazing Preference;
> Ownership of Range Improvements and Livestock Water Rights; and
> Temporary Changes of Use**

Plaintiff additionally challenges five changes in the final rule.  Each of these changes is

described below.

First, the final rule adds a requirement that BLM cooperate with Tribal, state, county or

local government-established grazing boards in the review of range improvements and allotment

management plans.  See 43 C.F.R. § 4120.5-2.  The Final Rule recognizes the value of grazing

boards in gathering information and providing additional local input to BLM.  The Final Rule

"formalize[s] the role of grazing boards in providing input and helping to avoid or resolve

conflicts between BLM and grazing permittees and lessees."  FEIS at 5-69.[4]

---

[4]It is ironic that plaintiff contends the Final Rule excludes the public, when the rule actually
formalizes the role of certain members of the public, such as states and tribes, in the decision-
making process. FES at 5-69.  Plaintiff's concern is not with exclusion of the public, but with
exclusion of itself.  At any rate, as discussed above, the Final Rule does not exclude the public.

Second, the final rule expands the term "grazing preference" and leaves in place the definition added to the regulations in 1995.  43 C.F.R. § 4100.0-5 (definitions).  The definition was amended to give preference holders a priority status for available forage that occurs within his or her allotment.  Addendum at 23-24.  In addition, and as BLM has explained, the new definition removes administrative inconsistencies by making the definition  correspond with the requirement at 4110.2-2 that livestock forage allocations on public land be made within a multiple use context as set for in land use plans.  See FEIS at 5-90.

Third, the final rule amends section 43 C.F.R. § 4120.3-2 to allow shared title of permanent range improvements constructed under cooperative range improvement agreements.  Title is shared in proportion to the permittee's and the United States' contributions to on-the-ground project development and construction costs.  71 Fed. Reg. at 39,410-39,411.  BLM's data indicate that since the 1995 regulations, which did not allow for shared title, the construction of range improvements has declined.  Id. at 39,410.  The final rule will allow operators to maintain some asset value for investments made, and will improve working relationships and encourage private investment in range improvements.  Id.; see also Addendum at 27.  As BLM has explained, "[p]rivate investment in range improvements may lead to better overall watershed conditions and improved wildlife habitat."  71 Fed. Reg. at 39,411.[5]

Fourth, the final rule amends the provision related to livestock water rights by eliminating the existing requirement that BLM seek title, under applicable State law, to livestock water rights on the public lands.  See 43 C.F.R. § 4120.3-9.  The amended regulation instead

_____

[5]There is no dispute that the Secretary's has discretionary authority under the TGA to grant ownership rights of range improvements.  Public Lands Council, et al. v. Babbitt, 529 U.S. 728, 750 (2000) (internal citations omitted).

provides flexibility by allowing permittee ownership and joint ownership of such rights. 71 Fed.

Reg. at 39,415. As BLM has explained, the Final Rule does not mean that BLM will never seek

ownership of livestock water rights, if State law allows. Addendum at 42. Further, BLM has not

seen any evidence that permittee or joint ownership of such rights discourages cooperation or

compliance with terms and conditions of grazing permits. 71 Fed. Reg. at 39,415. In fact, BLM

expects that such additional flexibility will facilitate BLM's ability to administer grazing permits

and leases in varied circumstances, id., as well as "result in improved cooperation between the

BLM, States, permittees, and lessees." Addendum at 42.

Finally, the final rule added language to the existing regulatory provision addressing

BLM's authorization of temporary changes in grazing use within the terms and conditions of

permits and leases. See 43 C.F.R. § 4130.4. The additional language explains in more detail

that "within the terms and conditions of the permit or lease" includes temporary changes in

livestock number, period of use, or both, under certain circumstances. See 71 Fed. Reg. at

39,475. The final rule retains the requirement that permittees and lessees must apply for, and

BLM must approve, any such changes.

## III. LEGAL BACKGROUND

### A. STANDARDS FOR A TRO AND PRELIMINARY INJUNCTION

A preliminary injunction is an extraordinary remedy, and plaintiff has the burden to

prove by clear and convincing evidence that the remedy is appropriate here. Granny Goose

Foods, Inc. v. Brotherhood of Teamsters, 415 U.S. 423, 442 (1974). The standard for granting a

temporary restraining order ('TRO') is identical to that for a preliminary injunction. Hawaii

County Green Party v. Clinton, 980 F.Supp. 1160, 1163 (D. Haw. 1997). To obtain a

preliminary injunction, a party must show either: 1) a combination of probable success on the merits and the possibility of irreparable injury; or 2) that serious questions are raised and the balance of hardships tips sharply in its favor.  Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc., 240 F.3d 832, 839-40 (9th Cir. 2001).

These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases.  Roe v. Anderson, 134 F.3d 1400, 1402 (9th Cir. 1998).  Under either formulation of the test, plaintiff must still demonstrate a significant threat of irreparable injury.  Oakland Tribune, Inc. v. Chronicle Publishing Co., 762 F.2d 1374, 1376 (9th Cir. 1985).

The relative hardship to the parties is the critical element in deciding at which point along the continuum a stay is justified.  Benda v. Grand Lodge of Int'l Ass'n of Machinists, 584 F.2d 308, 314-315 (9th Cir. 1978).  These traditional equitable rules for injunctive relief are not altered by the invocation of environmental statutes, such as NEPA, and there is no presumption that an injunction automatically follows the violation of environmental statutes.  Weinberger v. Romero-Barcelo, 456 U.S. 305, 313 (1982).  In balancing the relative hardships, there is also no presumption that environmental harm should outweigh other harm to the public interest.  Fund for Animals, Inc. v. Lujan, 962 F.2d 1391, 1400 (9th Cir. 1992).  Additionally, if the public interest is involved, as it is here, a court must determine whether the balance of public interests supports the issuance of an injunction.  Carribean Marine Serv. v. Baldrige, 844 F.2d 668, 674 (9th Cir. 1988).

The Ninth Circuit has further modified the test for an injunction when considering ESA cases such that the balance of hardships and the public interest tip heavily in favor of protected

species.  Friends of the Earth v. U.S. Navy, 841 F.2d 927, 933 (9th Cir. 1988).  The Ninth Circuit,

however, has also found that "[f]ederal courts are not obligated to grant an injunction for every

violation of the [ESA]."  Nat'l Wildlife Fed'n v. Burlington N. RR, 23 F.3d 1508, 1511 (9th Cir.

1994).  Indeed, this Circuit has stated that in order to obtain an injunction for a substantive

violation the ESA, plaintiffs must demonstrate a "reasonable likelihood" of irreparable harm

because there is no presumption of irreparable harm.  Burlington Northern, 23 F.3d at 1511 &

1512 n.8 ("a definitive threat of future harm to protected species [is required], not mere

speculation.").  Many courts have held that irreparable harm is a fact that must be presented as

evidence to the Court.  Caribbean Marine, 844 F.2d at 674 (holding that allegations of

speculative injury do not suffice).

### B.  NATIONAL ENVIRONMENTAL POLICY ACT

The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§4321 et seq., requires

federal agencies to examine the environmental effects of proposed federal actions, and to inform

the public of the environmental concerns that went into the agency's decision-making.  Baltimore

Gas and Elec. Co. v. Natural Res. Def. Council, 462 U.S. 87, 97 (1983).  NEPA requires

agencies to prepare environmental impact statements ("EIS"s) on all proposals for "major federal

actions significantly affecting the quality of the human environment," and outlines the contents

of such statements.  42 U.S.C. 4332(2)(C).  As explained by the Council on Environmental

Quality ("CEQ"), the ultimate goal

> of course * * * is not better documents but better decisions * * * .  NEPA's
> purpose is not to generate paperwork - even excellent paperwork - but to foster
> excellent action.  The NEPA process is intended to help public officials make
> decisions that are based on understanding of environmental consequences, and
> take actions that protect, restore, and enhance the environment.

40 C.F.R. 1500.1(c).

Because NEPA is essentially a procedural statute, it does not require an agency to reach a particular result based on the information it collects and analyzes.  Robertson v. Methoq Valley Citizens Council, 490 U.S. 333, 350-351(1989).  Instead, the court employs a "rule of reason" test to determine whether the EIS contains a "reasonably thorough discussion of the significant aspects of probable environmental consequences."  Hells Canyon Alliance v. U.S. Forest Service, 227 F.3d 1170, 1177 (9th Cir. 2000)(citations ommited).  The court's review of an EIS is narrow, and the court must not substitute its judgment for that of the agency.  Id.

### C.  ENDANGERED SPECIES ACT

The Endangered Species Act confers upon the Secretaries of the Interior and Commerce responsibility for administering of the ESA, including designation of species as endangered or threatened. 16 U.S.C. §§ 1533(a), 1532(15).  The Secretaries administer the ESA through the FWS and the National Marine Fisheries Service ("NMFS"), respectively.  The Services designate species as endangered or threatened pursuant to the criteria and rule-making procedures mandated by section 4 of the ESA. 16 U.S.C. § 1533.  The Services also designate "critical habitat" for species.  Id.; see also id. § 1532(5) (definition of "critical habitat").

### 1.    Section 7

Under ESA § 7(a)(2), each federal agency must, in consultation with either FWS or NMFS , insure that any action authorized, funded, or carried out by the agency is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of the designated "critical habitat" of the species.  16 U.S.C. § 1536(a)(2).  To assist agencies in complying with this provision, ESA § 7 and the

implementing regulations set out a detailed consultation process for determining the biological

impacts of a proposed activity. 16 U.S.C. § 1536; 50 C.F.R. Part 402.

In brief, an agency proposing an action ("action agency") must first determine whether

the action "may affect" species listed as threatened or endangered under the ESA. 50 C.F.R. §

402.14.  If a determination is made that the action "may affect" listed species, the action agency

must either formally or informally consult with FWS or NMFS on the effects of its proposed

action.

If however, the action agency concludes by its independent determination that its actions

will have "no effect" on listed species or critical habitat, further consultation is not required.  As

the Ninth Circuit has explained, such a "no effect" finding "obviates the need for formal

consultation under the ESA."  Sw. Ctr. for Biological Diversity v. U.S. Forest Service, 100 F.3d

1443, 1447-1448 (9th Cir. 1996); Pac. Rivers Council v. Thomas, 30 F.3d 1050, 1054 n.8 (9th Cir.

1994) (stating that "if the [action] agency determines that a particular action will have no effect

on an endangered or threatened species, the consultation requirements are not triggered.").  The

regulations do not require that a "not likely to adversely affect" or "no effect" determination be

made in writing or in any particular form.  But see 50 C.F.R. § 402.12(b)(action agency must

prepare biological assessment for major construction activities).     Only when the action agency

makes a determination that its action is likely to effect listed species must the agency engage in

informal or formal consultation.  The regulations provide that   "[i]nformal consultation is an

optional process that includes all discussions, correspondence, etc., between the [consulting

agency] and the [action agency], designed to assist the [action agency] in determining whether

formal consultation . . . is required." 50 C.F.R. § 402.13(a).  If, during informal consultation, the

action agency determines that the action may affect but "is not likely to adversely affect" a listed species and the consulting agency concurs in writing, consultation is complete. Id.

If the consulting agency does not concur with the "not likely to adversely affect" determination or if the agencies agree that the action is likely to adversely affect a listed species, formal consultation must be undertaken. 50 C.F.R. §§ 402.13-402.14. As part of a formal consultation process between the action agency and NMFS or FWS, the consulting agency will issue a "biological opinion" in which the consulting agency explains the effects of the action on listed species and determines whether or not the action is likely to jeopardize the continued existence of the species or adversely modify designated critical habitat. ESA § 7(a)(3)(A), 16 U.S.C. 1536(b)(3)(A).

## 2. Section 11

Federal government officials have primary responsibility for implementing and enforcing the ESA. See 16 U.S.C. §1540(a), (b), and (e)(6). The ESA also authorizes citizen enforcement suits "to enjoin any person, including the United States and any other governmental instrumentality or agency ... who is alleged to be in violation of any provision of [the ESA] or regulation issued under the authority thereof." 16 U.S.C. § 1540(g)(1)(A). No action may be commenced under either of the citizen suit provisions described above "prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation." 16 U.S.C. § 1540(g)(2)(A)(i), § 1540(g)(2)(C).

## D.  JUDICIAL REVIEW

Judicial review of challenges to the agency decisions of BLM under both NEPA and the ESA is pursuant to the Administrative Procedure Act ("APA"). *See*, Sw. Ctr. for Biological

Diversity v. U.S. Bureau of Reclamation, 143 F.3d 515 (9th Cir. 1998); Marsh v. Oregon Natural

Res. Council, 490 U.S. 360, 378 (1989).  Pursuant to the APA, the Courts review an agency

action solely to determine whether the action was "arbitrary, capricious, an abuse of discretion,

or otherwise not in accordance with law." 5 U.S.C. 706(2)(A).  Citizens to Preserve Overton

Park v. Volpe, 401 U.S. 402, 416 (1971), abrogated on other grounds, Califano v. Sanders, 430

U.S. 99(1977); Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't. of Navy, 898 F.2d 1410 (9th

Cir. 1990).  The scope of review under the arbitrary and capricious standard is deferential,

especially in APA cases involving an agency's construction of statutory and regulatory schemes

that the agency is responsible for administering.  Chevron U.S.A., Inc. v. Natural Res. Def.

Council, 467 U.S. 837, 842, 843 (1984); Thomas Jefferson University v. Shalala, 512 U.S. 504,

512  (1994); Chicano Educ. and Manpower Servs. v. U.S. Dep't of Labor, 909 F.2d 1320, 1325

(9th Cir. 1990)("The Secretary's interpretation need not be the only one permitted by the

regulation, only a reasonable one.").

     The scope of review is also limited to the administrative record that was before the

agency at the time the agency made its decision.  Florida Power and Light Co. v. Lorion, 470

U.S. 729, 743 (1985); Camp v. Pitts, 411 U.S. 138, 142 (1973).

## IV.  ARGUMENT

     A preliminary injunction is not needed pending this Court's review of plaintiff's facial

challenge to the new regulations.  No irreparable harm will befall WWP, or anyone else, when

the regulations become effective because the regulations, without further action by the agency,

do not change the on-the-ground management of the range.  The regulations do not predetermine

any grazing management decisions for any specific allotments; do not authorize, fund, or carry

out any habitat or resource-disturbing activities; do not make any grazing permit decisions; and do not establish specific standards or guidelines for management of resources. Any physical or socio-economic effects that may occur will arise only when future management decisions are made that implement the grazing regulations. Moreover, those impacts are not foreseeable, as they are unknown.

Given that the regulations will not automatically change range conditions or management when they become effective, it is not surprising to find that WWP's allegations of irreparable harm are all speculative (involving misapprehensions about how the regulations will be implemented) and lack any immediacy. In short, as discussed below, there is simply no legitimate risk of irreparable harm that would justify the issuance of a preliminary injunction given the nature of the regulations being challenged and the type of facial challenge being raised by WWP.

Moreover, WWP cannot show a likelihood of success on the merits. A facial challenge to the substance of a regulation can succeed only when it can be established "that no set of circumstances exists under which the [regulation] would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987).[9] Given this standard, WWP does not even attempt to argue the merits of its claims that BLM exceeded its statutory authority but instead focuses solely on alleged violations of the ESA and NEPA. As discussed below, WWP has no chance of success on these claims. The ESA claims are not justiciable given the lack of notice provided by WWP and, even if they were, the no-effect determination is amply justified given that the regulations do not alter

---

[9] Although Salerno involved a constitutional challenge, the Supreme Court has applied the same standard to claims that a regulation lacks statutory authority. INS. v. Nat'l Ctr. for Immigrants' Rights, 502 U.S. 183, 188 (1991).

the on-the-ground management without further decision-making by the agency – future actions

that will be subject to the ESA consultation process and the NEPA assessment process separately

as appropriate.  With respect to NEPA, the administrative record demonstates that the BLM

made the required "hard look" at each of the issues now raised by WWP.  Ass'n of Public

Agency Customers v. BPA, 126 F.3d 1158, 1183 (9th Cir. 1997).   The criticisms that WWP now

raise are founded on misconstructions of the new regulations and amount to mere "flyspecking"

that has been consistently rejected by the Ninth Circuit as grounds for finding a NEPA violation.

Id. at 1184.

**A.    Plaintiff Cannot Show that Effectiveness of the Final Rule will Cause
       Immediate Irreparable Injury**

**1.    Plaintiff Has Failed to Demonstrate Immediate Irreparable Injury to
       Protected Species**

The Ninth Circuit has found that in order to obtain an injunction for a substantive

violation of the ESA, plaintiffs must demonstrate a "reasonable likelihood" of irreparable harm.

Nat'l Wildlife Fed'n v. Burlington N. R.R., 23 F.3d 1508, 1511 (9th Cir. 1994).  In NWF v.

Burkington, the court clarified that the traditional equitable test for injunctions still applied in

ESA cases.  Id.  The court stated that "these cases [including TVA] do not stand for the

proposition that courts no longer must look at the likelihood of future harm before deciding

whether to grant an injunction under the ESA. Federal courts are not obligated to grant an

injunction for every violation of the law."  Id.  In addition, this Circuit has stated there is no

presumption of irreparable harm.  Burlington N., 23 F.3d at 1512 n.8 ("a definitive threat of

future harm to protected species [is required], not mere speculation.");  Save the Yaak Comm. v.

Block, 840 F.2d 714, 722 (9th Cir. 1988); Amoco Produc. Co. v. Village of Gambell, 480 U.S.

531, 544-545 (1987)(reversing a preliminary injunction premised on Ninth Circuit's presumption of irreparable damage when an agency fails to evaluate thoroughly the environmental impact of a proposed action).

Plaintiff incorrectly contends that the drastic relief of an immediate injunction is warranted in this case.  To meet its burden to show that immediate injunctive relief is necessary, plaintiff must provide evidence that there is a reasonable likelihood that, absent an immediate injunction of the regulations, protected species will be irreparably harmed.  Here, plaintiff has not met this burden.  Although plaintiff offers evidence that grazing may impact protected species and their habitats, that evidence, however, is not the proper inquiry for this Court. Campbell Decl. at ¶¶ 16-19; Carter Decl. at ¶¶ 20-47, House Decl. at ¶¶ 9,10, 34-40.  The issue before this court is not whether grazing, as general matter, may affect species.  The question is whether implementation of the new regulations will have immediate and irreparable impacts on species.  Plaintiffs cannot demonstrate that the regulations will irreparably harm species, because the regulations, in an of themselves, do not authorize or permit grazing.  Although the regulations do make changes to the administrative manner in which grazing permits may be issued or processed, the regulations, alone, do not change the amount of grazing that will occur on the ground.  Plaintiffs declarants have testified as to the effects grazing may have on listed species.  Any authorization of grazing that could have such an effect can only occur after BLM takes further administrative action.  At that point, BLM would be required to evaluate whether its action in authorizing grazing would have an effect on listed species.  This is the "on the ground" authorization where the effects of grazing on endangered species is considered.  43 C.F.R. 4130.1-1; 43 C.F.R. 4130.2.   It is at this point in the administrative process, not at the

current regulatory stage, where the action is such that it might affect species.  That is where harm

could occur, not at the current stage, where BLM's actions are limited to establishing

administrative practices.

Plaintiffs declarations only reinforce this concept.  Without any more specificity, plaintiff

cites to the entire declarations of House, Fite, Campbell, Carter and Marvel to support its

argument that the new grazing regulations will harm protected species.  Pl. ESA Br. at 20.  But

not one of those declarants is able to carry plaintiff's burden of demonstrating a reasonable

likelihood of irreparable harm to listed species from the implementation of the regulations.  For

example, Fite explains that grazing has caused irreparable harm on particular allotments.  Fite

Decl. at ¶¶ 67-68.  Similarly, Campbell describes impacts from grazing in general.  Campbell

Decl. at ¶¶ 12-14 These types of general statements of harm from grazing cannot support the

drastic measure of immediate injunctive relief.[7]  While Carter is the most specific in terms of

harm to species from long-term grazing, he still fails to show the causal connection between the

regulations and harm to listed species.   Carter Decl. At ¶¶ 17, 48-54, 68-69.  At points, he

actually describes the intervening actions that BLM must take for these regulations to have any

impact.  Id.  House even goes as far as to state that delays in grazing use changes may be caused

by intervening Section 7 consultation on those changes.  House Decl. at ¶¶41.  House and Carter

declarations do prove one thing - that the regulations are so far removed from any actual impacts

on the ground that enjoining them will not, and cannot, prevent the harm that the declarants

describe.  Plaintiff has not demonstrated that the regulations will irreparably harm protected

---

[7]Further, these statements relate to past harm under the old regulations and do not involve the
revised regulations.

species.  Thus, a preliminary injunction would no be appropriate. ve relief

## 2.  Plaintiff Has Failed to Demonstrate Other Irreparable Injury

Plaintiff's remaining allegations of irreparable injury suffer from the same fatal defects as those concerning endangered species – they are not allegations of imminent harm arising from the new regulations but rather are speculative fears of how future decisions may be made by the BLM.  In particular, plaintiff alleges irreparable harm because it will be excluded from participation in certain allotment decisions in the future, because the BLM will ignore the Fundamentals of Rangeland Health in making future decisions, and because permittees may have certain ownership rights to water and range improvements in the future.  Pl. Br. At 36-37.  None of these alleged harms, however, would arise as a necessary consequence of the new regulations and none could occur immediately, without further agency action, so as to warrant the issuance of a preliminary injunction in this case.

For example, the declarants assume that the Final Rule will exclude plaintiff from the public process, and yet, as explained above, the Final Rule does no such thing.[9]  The declarants also assert that the purported exclusion of plaintiff from any decision-making will certainly lead to adverse impacts to the environment.  Pl. Br. at 37 (citing Marvel Decl. at ¶¶ 73-78) Carter Decl. at ¶¶ 63-74 and exhs. 1-7, and Fite Decl. at ¶¶ 56-64, 69-100).  The declarations fail to identify, however, any immediate threat of exclusion, or how that will lead to purported environmental harm.  Further, many of the allegations relate to alleged past harm under the old

---

[9]In fact, BLM's addendum explains that "[m]ost, if not all, of the site-specific actions on an allotment that would impact the environment are usually included in the development of an allotment management plan and the planning of range improvements, both of which would still continue to require consultation, cooperation, and coordination with the interested public." Addendum at 38.

regulations and do not involve the revised regulations.

Nothing in paragraphs 73-78 of Mr. Marvel's declaration, for instances, discusses the purported exclusion of plaintiff from the public process, and any consequential environmental harm. Likewise, Dr. Carter's declaration fails to provide any support for his conclusion both that plaintiff will be excluded from the process under the new rule, and that such exclusion will lead to immediate environmental harm. Finally, while Ms. Fite's declaration assumes that plaintiff will be excluded from the planning and other decision-making processes, see ¶¶ 78, 94-100, nothing in those paragraphs explains how the alleged exclusion will lead to an environmental harm, and particularly, one that is immediate. Cf. Visser Decl. at ¶¶ 8-12.

Plaintiff also fails to demonstrate any significant threat of immediate irreparable harm as a result of the purported "gutting" of the Fundamentals of Rangeland Health. Not only do the Fundamentals remain intact, as discussed above, but the declarants fail to demonstrate any immediate threatened harm. Ms. Fite assumes irreparable harm will occur sometime in the future because it is "highly unlikely" that BLM will have multi-year monitoring data that will enable it to determine that standards and guidelines are not being met. Fite Decl. at ¶¶ 59, 61. These allegations are not only unsupported speculations about BLM's future decision making, but they completely ignore the fact that the regulations allow BLM to take immediate action if necessary. FEIS at 5-60; Addendum, Appendix G at 3; 43 C.F.R. 4110.3-3(b)(1); Visser Decl. at ¶ 25. There is thus no prospect of irreparable harm arising from the new grazing regulations treatment of the Fundamentals of Rangeland Health.[9]

---

[9]Likewise, plaintiff contends that irreparable harm will occur by allowing BLM to take two years to analyze changes to grazing management and another year to implement the changes, as well as allowing increases or decreases in grazing of more than 10% to be phased in over a

Finally, plaintiff fails to demonstrate any harm to it with respect to the ownership of water rights and range improvement projects. While their brief refers to difficulty "unravel[ing]" property rights at a later time, and the possibility that the United States will face takings claims in the future, there are no allegations of harm to plaintiff itself, and certainly no allegation of immediate harm that warrants the issuance of a preliminary injunction on the rule.[10]

**B.       Plaintiff Has Failed to Demonstrate a Likelihood of Success on the Merits**

**1.    The Court Lacks Jurisdiction Over Plaintiff's  ESA Claim**

As the party invoking federal jurisdiction, Plaintiff has the burden of showing that jurisdiction is proper and that a motion to dismiss pursuant to Fed. R.Civ. P. 12(b)(1) is not warranted.  Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp., 594 F.2d 730 (9th Cir. 1979); see also Thompson v. McCombe, 99 F.3d 352, 353 (9th Cir. 1996) ("A party invoking the federal court's jurisdiction has the burden of proving the actual existence of subject matter jurisdiction." citing Trentacosta v. Frontier Pac. Aircraft Indus., 813 F.2d 1553, 1559 (9th Cir. 1987)).  The Court is presumed to lack jurisdiction to hear Plaintiff's claims "unless the contrary affirmatively

---

period of five years. Pl. Brief at 36 (citing Fite Decl. at ¶ 65).  These speculative fears are unfounded and show a lack of understanding of how the rule operates (a point discussed infra), but in any event there can be no contention that such harm would occur immediately and without intervening agency action.  In fact, because the regulations allow BLM to take immediate action if necessary to protect rangeland health, there can be no legitimate contention that the regulations themselves will result in irreparable harm.  FEIS at 5-60; Addendum, Appendix G at 3; 43 C.F.R. 4110.3-3(b)(1); Visser Decl. at ¶ 25.

[10]In fact, paragraph 118 of plaintiff's proposed First Amended Complaint states that absent a preliminary injunction, the United States will face irreparable harm in the form of takings lawsuits.  Not only does this allegation fail to demonstrate any immediate harm to plaintiff, as it is focused solely on harm to the government, but it is based on pure conjecture.  Plaintiff fails to explain how a takings suit would emerge from the regulatory changes here.  In fact, plaintiff's citation to the Hage suit fails to support its forecast of immediate irreparable harm as the case has been pending in the United States Court of Federal Claims for over eighteen years.

appears."  Stock West, Inc. v. Confederated Tribes of the Colville Reservation, 873 F.2d 1221,

1225 (9th Cir. 1989).

> **a.      Plaintiff Failed to Provide BLM With Sixty-Days Notice of Its Intent to Sue**

The Court must dismiss plaintiff's ESA citizen suit count (Third Claim for Relief)

pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction.  In their Third Claim

for Relief, plaintiff claims that BLM has violated the terms of Section 7 of the ESA by failing to

engage in appropriate consultation.  As an alleged violation of the ESA, this claim is only

colorable under ESA Section 11, which requires a 60-day notice of intent to sue.  16 U.S.C

1540(g)(2)(C). The 60-day notice provision is jurisdictional, and plaintiff's failure to meet this

requirement deprives this Court of jurisdiction to hear plaintiff's claim.  Plaintiff failed to meet

the jurisdictional requirement to provide BLM 60-days notice of its intent to sue, therefore the

Court cannot hear this claim.

The Ninth Circuit has held that compliance with the sixty-day notice provision of the

ESA is jurisdictional and has construed the requirement strictly.  See Sw. Ctr. for Biological

Diversity v. U.S. Bureau of Reclamation, 143 F.3d 515, 520 (9th Cir. 1998) ("A failure to strictly

comply with the notice requirement acts as an absolute bar to bringing suit under the ESA");

Save the Yaak Comm. v. Block, 840 F.2d 714, 721 (9th Cir. 1988) (holding that the sixty-day

notice requirement under the citizen suit provision of the ESA is jurisdictional).  The sixty-day

notice requirement provides for a litigation-free window within which the government agency

may, if warranted, cure any alleged violation.  See Gwaltney of Smithfield, Ltd. v. Chesapeake

Bay Found., 484 U.S. 49, 60 (1987); Marbled Murrelet v. Babbitt, 83 F.3d 1068, 1072 (9th Cir.

1996) ("The purpose of this notice is to give the federal government and any alleged violators an

opportunity to comply, and thus render a citizen suit unnecessary"). In this case, plaintiff failed

to provide BLM with a notice of intent to sue after BLM issued the final rule. In the absence of

such notice, BLM had no notice of any deficiencies in the rule and did not benefit from the sixty-

day litigation-free period.

> **b.      Pre-Violation Notice Is Not Sufficient**

To the extent plaintiff argues that their July 22, 2005 notice satisfies the requirements of

ESA Section 11, the Court must reject this argument.   It is well-settled that pre-violation or

anticipatory notices of intent to sue do not satisfy jurisdictional citizen suit notice requirement.

See American Rivers v. NMFS, 109 F.3d 1484, 1492 (9th Cir. 1997) (notice of intent to sue to

challenge a prior biological opinion and "any revised or replacement biological opinion" failed

to satisfy the jurisdictional requirement)*, vacated and remanded on other grounds by* 126 F.3d.

1118 (9th Cir. 1997).   In American Rivers, the Ninth Circuit reiterated the Supreme Court's

command in Hallstrom v. Tillamook County, 493 U.S. 20, 29 (1989), that citizen suit notice

requirements must be construed strictly, and that equitable or pragmatic considerations were

irrelevant to application of the jurisdictional requirement.   See also Atlantic States Legal Found.

v. United Musical Instruments, 61 F.3d 473 (6th Cir. 1995) (notice of intention to hold

manufacturer liable for future violations of environmental statute failed to satisfy statute's

requirement for sixty-day notice).

Here, as plaintiff admits in its July 2005 Notice ("BLM is poised to publish new grazing

regulations..."), plaintiff's notice was based on the *proposed* rule. A proposed rule under the

ESA is not a final agency action- it neither marks the "consummation of the agency's

decisionmaking process" nor is it an action "from which legal consequences will flow." Bennett

v. Spear, 520 U.S. 154, 178 (1997).  One cannot sue on a proposed rule, and therefore one cannot

provide a notice of "violation" at the proposed rule stage.  Simply put, until the rule was issued

in final, there could be no violation of the ESA, and thus no notice of any alleged violation.

Over two years lapsed between publishing the proposed rule and the final rule.   Since the

final regulation has issued, plaintiff has failed to provide any notice of intent to sue which would

provide BLM with a litigation-free window in which to evaluate any alleged deficiencies with

the final regulation.  Plaintiff has failed to meet the ESA citizen suit's notice requirement, and

therefore has failed to properly invoke the jurisdiction of this Court.  Accordingly, plaintiff's

Third claim of the First Amended Complaint must be dismissed for lack of jurisdiction.

### 2.      In Addition to the Lack of Jurisdiction, Plaintiff Has Failed to Demonstrate A Likelihood of Success on the Merits of Its ESA Claim

Even if the Court declines to rule on the motion to dismiss at this time, the likelihood of

plaintiff's success on the merits of its ESA claim is low, which warrants denial of the preliminary

injunction motion.  Plaintiff has failed to show a likelihood of success on the merits of its ESA

claim because the regulations will not and cannot, without additional action taken by BLM, result

in impact to species protected by the ESA.

As part of the 1995 regulatory amendments, BLM considered whether changes to the

administrative components of the grazing regulations may affect listed species.  During the

review of those regulatory amendments, BLM concluded, and FWS concurred, that the

administrative components of Rangeland Reform would have no effect on listed species.

Addendum, Appendix G at 1, 1994 Rangeland Reform Biological Opinion at 27-29, 1994

Rangeland Reform Biological Assessment at 35-38, 40.

BLM considered the same question for the current amendments to the administrative

components of the grazing regulations and, similarly, concluded that the current revisions will also have no effect on ESA listed species. The agency's rationale for its no effect finding was documented in writing in the Addendum to the FEIS entitled "Effects Determination under the ESA," dated March 31, 2006. As explained there, the recent regulations merely clarify and change certain administrative components of the 1995 Rangeland Reform provisions. Moreover, the amendments do not change the fact that several intervening steps dictated by current grazing regulations must occur before there are any actual changes to how BLM manages grazing on-the-ground that could impact listed species. Without these additional steps, the regulations will not have an effect on listed species. Accordingly, BLM reasonably concluded that the revisions to the administrative components of 1995 Rangeland Reform will have no effect on listed species.

### a. BLM's "No Effect" Determination Was Not Arbitrary and Capricious

Plaintiff asserts that BLM is required to consult with the Services because "[t]he record before the Court is overwhelming in showing that the new regulations will adversely affect" protected species. Pl. ESA Br. at 14. That is simply not true. The regulations do not predetermine any on-the-ground grazing decisions. The regulations are administrative changes that do not directly require or allow any changes in the actual management of grazing on the ground. Any "effects" on listed species would result solely from future, and at this point hypothetical, management activities undertaken pursuant to the existing grazing regulations. Those plans, permits and projects will be subject to the consultation process separately as appropriate. To skirt the fact that the regulations have no on-the-ground effect and support its argument that they "may affect" listed species, plaintiff jumps straight from the agency action - revising administrative portions of the grazing regulations - to alleged effects on listed species.

31

That theory, however, assumes that a set of hypothetical events will actually occur in between the agency action and plaintiff's alleged effects.

As the discussion below will demonstrate, the "effects" that plaintiff claims require consultation either do not flow from the actual agency action at issue here or are uncertain and unpredictable as intervening steps between the regulations and on-the-ground changes to grazing. The ESA does not require agencies to consider hypothetical or uncertain effects. Instead, the consultation regulations require that an action agency consider effects that are "reasonably certain to occur." 50 C.F.R. §402.02 (defining indirect effects). At the regulatory amendment stage, there are any number of future probabilities that could occur on the management of an allotment. As BLM is required to take action at those various stages, BLM will have to consider whether actions at those stages effect species. As discussed above, the Court's analysis must be conducted under the APA's arbitrary and capricious standard of review. Because the regulations merely address administration of the grazing regulations and "do not themselves authorize actions," BLM's conclusion that those revisions have no effect on protected species is not arbitrary and capricious. Addendum, Appendix G at 2.

First, Plaintiff takes issue with the multi-year monitoring requirements contained in the regulations. Plaintiff argues that BLM lacks the staffing and funding to conduct this monitoring, which will lead to further degradation of the range. Pl. ESA Br. at 9. Plaintiff argues that such degradation will occur on allotments with listed species and necessarily will harm such species.[11][11] Id. Plaintiffs overstate the effects of this change to required monitoring. The grazing

_____

[11]It is important to note that section 7 consultation would have occurred in the past and will occur in the future on allotment management plans and actual grazing permits if those agency actions may affect listed species.

regulations already required monitoring, and monitoring data will already exist in the majority of the allotments where resource values are high or resource issues are anticipated. FEIS 5-78; Addendum at 32-34. This change does not require new data; it simply clarifies that BLM use new or existing data to identify the causes for not meeting Rangeland Health standards and improve decision-making on solutions to improve Rangeland Health. Id. Moreover, Plaintiff's own argument indicates that this is not the type of action that requires consultation. Rather than indicating how the monitoring will effect species, Plaintiff speculates first that BLM will not conduct the monitoring and second, that if BLM does the monitoring, it will delay decision making rather than lead to more informed agency action. As indicated in the FEIS, the purpose of the monitoring changes is to help focus BLM resources, including funding and staffing, where monitoring is needed to improve decision-making. FEIS 4-31, Addendum at 33. Plaintiff cannot create an "effect" by arguing that BLM will fail in its attempt to improve agency decision making. Further, Plaintiff fails to indicate how the amendment to the monitoring requirement effects species in a way that the previous regulation did not. Before the issuance of the new regulations, the rangeland officer was already required to modify grazing if it was the cause for an area's failure to meet a rangeland health standard. Addendum, Appendix G at 4; 43 C.F.R. 4110.3-3(b)(1)(i)-(ii). This basic and underlying requirement has not been altered. Plaintiff has failed to demonstrate that this requirement will effect listed species.

Plaintiff also claims that the new regulations extend the deadline to implement new grazing decisions and that "ensure[s] that grazing degradation will continue." Pl. ESA Br. at 10. First, this change was included in the regulations, among other reasons, to allow BLM time to complete consultation on any grazing use change if required by Section 7. Addendum at 35.

Again, plaintiff overlooks the fact that the extension to implementing grazing decisions at the permit level does not apply when changes to grazing use must occur immediately to protect listed species. FEIS at 5-60; Addendum, Appendix G at 3; 43 C.F.R. 4110.3-3(b)(1)(i)-(ii). Similarly, plaintiff states that "changes needed immediately to protect imperiled species will not be implemented when needed." Pl. ESA Br. at 10. That is simply not true because extending grazing reductions to five years would not be allowed through BLM's existing regulations when it would impact a listed species. Addendum, Appendix G at 3; 43 C.F.R. 4110.3-3(b)(1)(i)-(ii).

Further, plaintiff asserts that ownership of range improvements will "cause habitat degradation and weed invasion, harming listed species." Pl. ESA Br. at 10. Nothing in these regulations, contrary to plaintiff's assertions, allow immediate ownership of range improvements. Addendum, Appendix G at 3. Rather, the regulations allow a permittee and BLM to *share* title to improvements. Addendum at 27. Any improvements must first be approved by BLM and must be consistent with land use plans and allotments plans, both of which would be subject to consultation if they "may affect' listed species. Id.; see also 43 C.F.R. §§ 4120.3-1(e), 4120.3-2(d).

Finally, plaintiff claims that the new regulations exclude the interested public and "result in adverse impacts through BLM's adoption of grazing practices favored by ranchers." Pl. ESA Br. at 10. The grazing regulations do not change the interested public's involvement in land use and allotment planning. FEIS 5-20; Addendum, Appendix G at 3. BLM believes that such public participation in broad-level management decisions ensures that the interested public can continue to monitor and provide input to BLM grazing decisions. FEIS 2-24, 2-25. The change simply gives the rangeland officer the discretion to involve the interested public in the day-to-day

operations.  Id.  That officer must, according to existing grazing regulations, ensure that daily

operations comply with land use and allotment plans and with Section 7 consultations undertaken

for those land use and allotment plans.  43 C.F.R. 1610.2; 43 C.F.R. 1610.5-3.

Plaintiff's attenuated theory of effects is supported, plaintiff claims, by the fact that the

"may affect" threshold is satisfied easily and simply requires the presence of species.  Essentially,

plaintiff argues that, to prevail on the merits, it is not required to show that these regulations "may

affect" listed species, but rather only that listed species are "present across the Western lands

subject to grazing under the regulations."  Pl. ESA Br. at 16.  This standard is not consistent with

the applicable provisions of the ESA or its regulations, which, as discussed above, require

consultation only where an agency's action "may affect" a listed species.  Moreover, the cases

cited by plaintiff do not support the conclusion that the "may affect" standard is always

essentially coterminous with whether a listed species "may be present" in the action area, as

plaintiff apparently argues, Pl. ESA Br. at 14-16.  See, e.g., Pac. Rivers Council v. Thomas, 30

F.3d 1050, 1055 (9th Cir. 1994) (holding that because the Forest Plans made on-the-ground land

use decisions in area surrounding spawning habitat of listed fish, the Forest Service must consult);

Thomas v. Peterson, 753 F.2d 754 (9th Cir. 1985)(holding that the Forest Service must consult on

effects from actual timbers sales when the sales will occur in Rocky Mountain gray wolf habitat);

Center for Biological Diversity v. Leavitt, No. C 02-1580 JSW, 2005 WL 2277030 (N.D. Cal.

2005)(holding that the presence of the red-legged frog triggered the action agency's obligation to

determine whether use of pesticides "may affect' the red-legged frog).

In fact, in order to give the "may affect' threshold some meaning, plaintiff must show a

causal connection between the administrative revisions at issue here and potential effects on listed

species.   Center for Biological Diversity v. Leavitt, 2005 WL 2277030 at *4.  The declarations

submitted by plaintiff offer only general arguments of effects from grazing – essentially arguing

that grazing causes adverse effects to species - and speculation and "hypotheses" to connect these

amended regulations to potential effects on listed species. See supra Decls. cited at p. 22.

Statements in the Carter and House declarations actually support the argument that there is no

causal connection between these regulations and the effects plaintiff claims.  Carter, Decl at ¶¶

17, 48-54; House Decl. At ¶41.  Those statements highlight the fact that there are intervening

steps where BLM must take action that occur between these new regulations and authorized

grazing where Section 7 consultation will occur if the intervening action "may affect' listed

species.   Accordingly, the statements are overbroad, inaccurate, and fail to demonstrate that the

regulations "may affect" listed species.

Plaintiff attempts to further cloud the issue of whether consultation is required by

contending that BLM's no effect determination is arbitrary because it was not based on the best

available science.  Pl. ESA Br. at 16.  Indeed, the ESA directs agencies to make decisions based

on the "best scientific and commercial data available" 16 U.S.C. §1536(b)(a)(2).  The Supreme

Court has stated that the "obvious purpose of the requirement that each agency 'use the best

scientific and commercial data available' is to ensure that the ESA not be implemented

haphazardly, on the basis of speculation or surmise. While this no doubt serves to advance the

ESA's overall goal of species preservation, we think it readily apparent that another objective (if

not indeed the primary one) is to avoid needless economic dislocation produced by agency

officials zealously but unintelligently pursuing their environmental objectives." Bennett v. Spear,

520 U.S. 154, 176-77 (1997) (discussing the §7(a)(2) requirements).

36

Here, plaintiff claims that Dr. Erick Campbell, other agencies, scientists and conservation groups represent the best available science.  Pl. ESA Br. at 17.  In its consideration of the revisions' effects on listed species, BLM acknowledges the opinions of these experts that grazing has impacts on threatened and endangered species and their habitats.  2004 FEIS at 3-43-45, 49, 53-56.  The impacts of grazing on federal lands are, however, not relevant here because the agency action at issue does not authorize grazing.  Rather, the effects of administrative regulations are what BLM must consider when determining whether consultation is required under the ESA.  BLM, in fact, devoted four pages in the Addendum to explain why the DEIS and the FEIS did not include earlier language that discussed adverse effects of grazing on listed species.  Addendum at 50-53.  BLM explained in the addendum that it removed earlier analysis that was flawed because that analysis focused on the impacts of grazing rather than impact from administrative changes to the grazing regulations.  Addendum at 51.  That type of reasoned decision-making on how to evaluate effects on protected species from changes to BLM's grazing regulations must be given deference because BLM has expertise with respect to its grazing regulations.  See Environmental Defense Fund, Inc. v. Costle, 657 F.2d 275, 283 (D.C. Cir.1981) (arbitrary and capricious standard of review "mandates judicial affirmance if a rational basis for the agency's decision is presented . . . even though [a court] might otherwise disagree.")(citations omitted).

Accordingly, BLM reasonably decided that consultation at other points in the process of managing grazing, when specific land use or allotment plans, grazing permits or other management actions are at issue, will adequately – indeed better – enable the agency to insure that agency activities are not likely to jeopardize listed species.  Under these circumstances,

BLM's conclusion that the regulations have "no effect" on listed species is not arbitrary, capricious, or an abuse of discretion, and there is no need for further consultation. Southwest Center, 100 F.3d at 1447.

Indeed, a "no effect" conclusion is inescapable from a practical point of view. Because of the broad, general nature of this administrative rule, there is no reasonable basis for assessing or quantifying the specific effects of any subsequent actions on endangered or threatened species. The impracticability of consultation at this level of generality is apparent from a glance at the list of endangered and threatened species on BLM lands. 1994 Biological Opinion, Appendix F at 155. Hundreds of endangered species occur on BLM lands. Id. Plaintiff does not explain how the BLM or the consulting agencies could possibly determine whether promulgation of the revisions are "likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat" (16 U.S.C. § 1536(a)(2)) without further details of actual land use or allotment planning, grazing permit requirements or specific management activities that would affect particular species on particular BLM lands.

### b. BLM Complied with the Procedural Requirements of the ESA

Section 7(a)(2) does not specify the manner in which an agency must fulfill its consultation responsibilities. Rather, the ESA and its implementing regulations simply require action agencies to engage in consultation at such time and in such a manner as is necessary to insure that the actions that "fund, authorize or carry out" species or habitat disturbing activities would not be likely to jeopardize the continued existence of listed species or designated critical habitat. Further, neither the ESA nor its implementing regulations dictate the form or content of a

"no effects" determination.[12][12]

Here, consultation at the rule-level is required only to the extent that consultation is essential in order to insure compliance with section 7(a)(2)'s substantive mandate to avoid the likelihood of jeopardy.  As discussed above, BLM complied with section 7(a)(2)'s substantive mandate when it reasonably determined that the revisions would have no effect on listed species.  That "no effect" determination concluded the informal consultation process, and section 7 does not require any further action.  See Sw. Ctr. for Biological Diversity, 100 F.3d at 1447; Pac. Rivers Council, 30 F.3d at 1054 n. 8 ("[I]f the agency determines that a particular action will have no effect on an endangered or threatened species, the consultation requirements are not triggered.").  Plaintiff, thus, cannot show that BLM failed to fulfill its procedural consultation obligations.

### 3.  Defendants Have Complied with NEPA

Plaintiff bases its claim of a NEPA violation on two arguments.  First, it claims that BLM's NEPA analysis is mis-leading and inaccurate because BLM's draft and final EIS's did not contain the same conclusions regarding impacts as were articulated in an early draft, referred to as the "Administrative Review Copy - Draft EIS" or "ARC-DEIS."  Second, plaintiff contends that BLM failed to adequately consider the direct, indirect, and cumulative impacts from the rule.  Neither argument can prevail.

### a.        Plaintiff Fails to Demonstrate a Violation by Relying on an

---

[12]Plaintiff argues in its ESA brief that the fact that BLM failed to list the species present in the action area is alone sufficient to cause a violation of the ESA. Pl. ESA Br. at 17.  Notably, plaintiff fails to cite the provisions of the ESA or its implementing regulations that require an action agency to identify listed species present when it determines there is "no effect."  Indeed, no such requirement exists.

**Internal Draft Document**

Plaintiff cannot credibly base its claim of a NEPA violation on differences between a preliminary EIS and later versions.  A draft is just that - an early attempt to articulate the NEPA analysis – and an agency should not be penalized for changing its analysis as the facts and theories are probed and the thinking evolves.  <u>Half Moon Bay Fisherman's Marketing Ass'n v. Carlucci</u>, 857 F.2d 505, 509 (9th Cir. 1988) ("Plaintiffs should have realized that the draft supplement was only a <u>draft</u> . . . its conclusions were tentative at best.") (emphasis in original).  In fact, BLM addressed this same argument squarely in the text of its Final Rule, as well as in its Addendum.

> As is BLM's usual practice, staff scientists and analysts prepared preliminary drafts of portions of the DEIS, then circulated their preliminary drafts among their colleagues.  We circulate such documents for internal review in an effort to produce a factually accurate, scientifically sound, and well-reasoned DEIS.  The administrative review copy represents a "snapshot" of an early stage of BLM's deliberative internal review process.  The text identified in the comment was revised as a result of further internal review . . . .

71 Fed. Reg. 39,402, 39,422.

Plaintiff contends that BLM purportedly "sanitized" the draft and final EIS's, and "completely revers[ed]" the analysis in the ARC-DEIS so that it could tell the public that grazing is supposedly "compatible" with wildlife and riparian vegetation.  Plaintiff's argument is belied by the record.  First, as the quote above demonstrates, BLM has acknowledged and explained that it has made changes in its analysis from the ARC-DEIS.  71 Fed. Reg. at 39,422; see also Addendum at 50.

Second, the draft and final EIS's do not attempt to portray livestock grazing as completely compatible with wildlife and riparian vegetation.  Both documents recognize that grazing has

impacts on wildlife and riparian vegetation. DEIS at 3-29, FEIS at 3-43 (noting that grazing, among other activities, has been a "major factor" affecting wildlife habitat); DEIS at 3-19 (noting that livestock grazing, among other activities, affects riparian systems); FEIS at 3-25, 3-26, 3-28. Thus, plaintiff's portrayal of the ARC-DEIS as a document that was "sanitized" is false.

As explained in detail in the Addendum, BLM made changes to the analysis in the ARC-DEIS as part of a genuine rule-making process that corrected mis-statements about the then proposed rule. Addendum at 50-53. For example, the ARC-DEIS incorrectly stated that upland and riparian habitats would continue to decline because the proposed rule would worsen an already burdensome appeals process and would decrease BLM's ability to control illegal activity on public lands. Addendum at 50. On the contrary, the proposed rule would not alter the appeals process, but would merely remove provisions from the grazing regulations that were redundant in light of the Office of Hearings and Appeals. Further, the rule still retained BLM's ability to control illegal activity on public lands. Id.

Likewise, the ARC-DEIS also incorrectly concluded that the proposed rule would greatly diminish BLM's ability to regulate grazing to the detriment of wildlife because it would defer to State water law. Id. In fact, the grazing regulations as they existed before the new rule deferred to state water law, 43 C.F.R. § 4120.3-9, and, at any rate, state water law does not necessarily prohibit BLM from holding water rights for beneficial uses such as wildlife and wildlife habitat. Id.

The Addendum also explained that the ARC-DEIS inaccurately assumed that the requirements for assessment and monitoring would negatively impact watersheds, when, in fact, ensuring more accurate data via longer monitoring will result in a correct diagnosis and remedy,

41

that outweighs the longer time required to collect data.  Addendum at 51-53.

Likewise, the Addendum explained that the ARC-DEIS inaccurately concluded that the changes to the definition of "interested public" would lead to the exclusion of environmental groups from the public process, and would give greater influence to local entities that purportedly favor extraction of forage and water resources at the expense of wildlife and biological diversity. Addendum at 53.  The Addendum explained that this conclusion was inaccurate, as the rule would not prevent or limit the ability of an environmental group, or any other interested member of the public, to participate in the appeals process, and provide input on BLM's development, analysis, and modification of range improvement plans, range development programs, Allotment Management Plans, Resource Management Plans and RMP amendments and NEPA documents. Id.

In sum, plaintiff's contention that BLM "sanitized" its later draft EIS and final EIS in an effort to disguise environmental impacts articulated in the ARC-DEIS is not true, and is belied by the record.  The record shows the development of the EIS and includes BLM's explanation of why it made changes to the ARC-DEIS.  See also Visser Decl. at ¶ 21.   Plaintiff has failed to demonstrate a NEPA violation simply because BLM made legitimate changes to a draft during its rule-making process.

Likewise, plaintiff's contention that BLM ignored the comments of state and federal agencies and independent scientists, Pl. Br. at 22, is belied by the record.  The FEIS and the addendum contain BLM's responses to the comments submitted during the rulemaking process. FEIS at Chapter 5; Addendum at 21-55.

> **b.** **BLM Adequately Considered Direct, Indirect and Cumulative Impacts**

b.      **BLM Adequately Considered Direct, Indirect and Cumulative Impacts.**

Most of Plaintiff's remaining NEPA allegations follow a well-worn argument path: begin by misinterpreting the regulation and then allege that BLM has failed to account for the impacts associated with the misinterpretation.  As discussed below, when the regulations are properly characterized, the record shows that BLM fully analyzed the impacts associated with the rulemaking.

### i.  Alleged Reduction in Public Participation.

Plaintiff argues that BLM failed to consider any adverse impacts associated with the alleged reduction in public participation in the Final Rule.  Pl. Br. at 23.  According to plaintiff, by requiring individuals and organizations to respond to each opportunity for comment or other "consultation, cooperation, and coordination," or risk exclusion from the public participation process, groups such as plaintiff will have to spend more time attempting to remain on the public list for each allotment, and therefore less time monitoring the allotments.  Pl. Br. at 23.  Plaintiff also predicts that BLM decisions will be less-informed by the alleged exclusion of the public, and that litigation will increase.  Pl. Br. at 23-25.  Likewise, plaintiff contends individuals and groups will be forced to comment on projects that they are not interested in, just to remain on the public list, thus increasing BLM's administrative burden.  Pl. Br. at 23.  According to plaintiff, BLM should have considered these effects.

The BLM did, in fact, specifically address the impacts associated with the change in the definition and role of the interested public.  FEIS at 4-27 – 4-28.  The FEIS addresses the issue of administrative burden, finding that the change "would result in minor administrative cost savings associated with maintaining the interested public mail list and in mailing costs."  FEIS at 4-27.

43

The FEIS also examines the impact on management functions, stating that the "narrowed focus would increase the efficiency of grazing management through the reduction of communication to individuals, groups or organizations that are not providing input supporting the decision making process on an allotment.  Id.

The remaining impacts alleged by the plaintiff are based on a misunderstanding of the regulations.  Contrary to plaintiff's assertions, the Final Rule does not exclude the public from the decision-making process.  See, supra, pages 7-10.  Submitting comments during formal public comment periods is still enough to qualify as a member of the interested public (FEIS at 5-96), and the change in no way affects BLM's public participation obligations under NEPA or other applicable statutes. [13]

Ironically, as proof of their allegations that the public will be excluded, plaintiff alleges that WWP has previously been excluded from the decision-making process on specific allotments, and that without their input, BLM has allowed grazing to continue at harmful levels.  See e.g., ¶¶ 62-63, 69 and 74-76 of Marvel's declaration.  Of course, these alleged harms would have occurred under the pre-existing regulations, not the new regulations, thereby highlighting that any impacts that may occur to Plaintiff would not be the result of the regulations, but rather result of an imperfect implementation of the regulations.  Of course, Plaintiff would have the ability to

---

[13]Plaintiff also complains that the regulations remove the public from participating in decisions to authorize temporary, non-renewable grazing use (TNRs), and that harm to the rangeland will result.  Pl. Br. at 32-33.  Once again, Plaintiff misconceives the impact of the regulations.  As explained in Mr. Visser's Declaration, under the regulations "[t]here are at least three opportunities for the interested public to comment or otherwise communicate regarding proposals to approve application for non-renewable grazing use."  Visser Decl. at ¶14.  Thus, contrary to the Plaintiff's fears, the regulations do not mean that TNR authorizations will occur without public notification or review, and there is no reason to analyze this non-existent impact in the FEIS.

administratively or judicially seek correction of these errors should they occur.

In sum, the BLM properly analyzed the effects of the change in the definition and role of the interested public in the FEIS.

### ii.  Changes to the Fundamentals of Rangeland Health

Plaintiff contends two purported changes to the Fundamentals of Rangeland Health will allegedly cause impacts overlooked by BLM: 1) an alleged requirement that BLM only consider multi-year monitoring data, instead of all data that is available; and 2) an alleged extension for taking action to revise grazing when it is violating the rangeland health standards.  Pl. Br. at 26-28.  Plaintiff contends that both of these alleged changes will delay implementation of management changes necessary to protect rangeland health because BLM purportedly does not have the resources to collect several years of monitoring data, and because the new rule will allow BLM to take years to take any action, particularly when the action requires a phase-in of decreases greater than 10%.  Pl. Br. at 26-27.  Again, plaintiff's argument that more NEPA analysis of the Final Rule is necessary is based on an incorrect construction of the rule.[14]

First, the Final Rule does not forbid BLM from utilizing a variety of data, nor does it require multi-year monitoring before BLM determines that existing grazing management

---

[14]Plaintiff also contends that there has been no proper NEPA analysis of the rule change that authorizes the BLM to approve temporary changes in grazing use that would allow ranchers to graze 14 days prior to or after the permitted season of use, as long as the rancher stays within the permitted amount of active use.  Pl. Br. 31.  Contrary to the plaintiff's allegations, this provision is discussed in the FEIS at 2-26 -- 2-27, and its anticipated impacts set out in the FEIS's discussion of grazing administration (FEIS at 4-28), vegetation (FEIS at 4-32), economic conditions (FEIS at 4-43), and social effects (FEIS at Table 4.3.14.1).  The change and its impact are further discussed in the response to comments (FEIS at 5.4.26).  Finally, as discussed in the Mr. Visser's declaration, the Plaintiff incorrectly asserts that this change will cause overgrazing or other unintended harms to the rangeland.  Visser Decl. at ¶¶ 17 - 20.

practices or levels of grazing use are significant factors in failing to achieve the standards or

conform with the guidelines.  As BLM explained on page 33 of the Addendum, once a standards

assessment indicates that rangeland is failing to achieve standards or that management practices

do not conform to guidelines, "the type and amount of new monitoring data, if any, that the BLM

will need . . . will vary depending on such variables as how apparent the causes are for not

meeting standards, the quantity and quality of existing relevant monitoring data, the presence of

threatened or endangered species, conflicts between uses, and other criteria."  In addition, BLM

has explained that the change will help focus resources, including funding and staffing, on those

places where monitoring is needed, and that BLM's experience indicates that the number of

allotments that need monitoring is relatively small.  See FEIS at 4-31; Addendum at 33.

BLM also addressed Plaintiff's assertion that BLM will be unable to muster the necessary

personnel and budget to focus on the limited number of areas where monitoring may be required.

As BLM explained, it will focus its monitoring resources on gathering the needed information,

and BLM does not anticipate that the proposed monitoring activity will overwhelm its capability

to effectively manage the public lands and implement needed management action within

regulatory deadlines.  Addendum at 33.  This is because BLM anticipates that, based on historical

experience, the total number of allotments needing additional monitoring is relatively small.  Id.

(stating that experience from 1998 - 2002 indicates that current livestock grazing or level of use

was a significant factor for not meeting land health standards on only 16% of the allotments

evaluated, requiring adjustments in current livestock management, and that from 1998 to 2005,

15% of the evaluated allotments were determined to be in this category).   BLM does not

anticipate a substantial increase in monitoring because it already has some monitoring data for

46

most of the allotments anticipated to fall into this category.  Id.

Plaintiff also attacks the NEPA analysis associated with the "24 month" rule, which allows BLM to take up to 24 months following a determination on rangeland standards for BLM to formulate, propose, and analyze the appropriate action.[15/]  71 Fed. Reg. at 39, 408.  Contrary to plaintiff's suggestions in its brief, BLM did analyze the effects of this change under NEPA. BLM's experience with the prior rule, which required BLM to take action by the start of the next grazing season, was that BLM did not always have sufficient time to comply with relevant laws such as NEPA and the ESA.  Addendum at 35, § 5.4.15.  While BLM acknowledged that "[s]ome short-term adverse effects may" be unavoidable because of the increase in timeframes associated with several components of the Final Rule, "[e]xtending the time for decisions would allow [BLM] to carefully develop, formulate, and analyze the appropriate action while ensuring that all legal and consultation requirements are satisfied."  Addendum at 17 (§ 4.5.4).  BLM anticipates that the long-term effects will be beneficial to rangeland health.[16/]  Id.

At the same time, if immediate action is needed to protect soil, vegetation, or other resources, BLM retains its discretion in Section 4110.3-3(b) to close an area to grazing either totally or partially.  FEIS at 5-82.  Under these regulations, BLM has authority to issue a decision

---

[15/]  The final rule also provides for an extension of the 24-month deadline when the legal responsibilities of another agency prevent completion of all legal obligations within 24 months. 71 Fed. Reg. at 39,494.  For example, if BLM is consulting under section 7 of the ESA on a decision, it cannot issue a final decision until the consultation is complete.  BLM cannot constrain the actions of another agency through its regulations.  Plaintiff mischaracterizes this provision as authorizing "indefinite" delays from which harm will ensue.  To the contrary, the allowance for an extension in the regulation is intended only to ensure that all legal obligations are complied with.

[16/]  The regulation also "allows BLM and the permittee to agree to a shorter timeframe for implementation." FEIS at 5-60.

47

with immediate effect to close an allotment or portion of an allotment to grazing or to otherwise

modify grazing use when grazing "poses an imminent likelihood of significant resource damage."

Furthermore, the regulations authorize the BLM to reduce active use or otherwise modify

management practices (or both) when monitoring or documented field observations show grazing

use or patterns of use are not consistent with the provisions of subpart 4180, or grazing is

otherwise causing an unacceptable level or pattern of utilization, or when use exceeds the

livestock carrying capacity.  43 C.F.R. § 4110.3-2(b); see also Visser Decl. at ¶ 25.  As BLM

explained in the FEIS, the amended regulation "is flexible enough to provide for immediate, full

implementation of a decision to adjust grazing use if continued grazing use poses an imminent

likelihood of significant soil, vegetation, or other resource damage."  FEIS at 5-60.

In sum, BLM did analyze in its NEPA documentation the changes in monitoring and time

deadlines of concern to Plaintiff.  Plaintiff's claims to the contrary are without merit and largely

based on a misinterpretation of the new regulations.

### iii.  Ownership Rights.

Next, plaintiff contends that BLM failed to sufficiently analyze the changes in the Final

Rule that allow joint ownership of rangeland improvement projects, such as fences, pipelines, and

water development, and allow permittees to hold title to water rights on the rangelands.

According to plaintiff, BLM failed to acknowledge that these changes will reduce BLM's

flexibility to modify or remove range improvement projects and to manage the water itself to

benefit wildlife or other resources.  Pl. Br. at 29.  Plaintiff also contends that BLM failed to

analyze the environmental and other effects of the likely increase in range improvement projects

and water development.  Pl. Br. at 29-30.

48

While plaintiff may not accept BLM's conclusions, the agency did in fact discuss the impacts associated with these changes in its rulemaking and NEPA documentation.  With respect to rangeland improvements, the Final Rule amends 43 C.F.R. § 4120.3-2 by providing for shared title of permanent range improvements in proportion to their contribution to on-the-ground project development and construction costs.  71 Fed. Reg. 39, 410. - 39,411.  BLM's data indicates that since the 1995 regulations, which did not allow for shared title, the construction of range improvements has declined.  Id. at 39,410.  BLM believes that sharing title allows operators to maintain some asset value for investments made, and will improve working relationships and encourage private investment in range improvements.  Id.; see also Visser Decl. at ¶ 22.  Consequently, the BLM concluded, "[p]rivate investment in range improvements may lead to better overall watershed conditions and improved wildlife habitat."  71 Fed. Reg. at 39,411.

In its NEPA documentation, BLM examined the rule change and explained that it will "provide operators an opportunity to maintain some asset value for their investments in range improvements, and may thereby stimulate an increase in private investments in range improvements."  Addendum at 27.  See also FEIS at 4-25 (advising that the rule change "may stimulate an increase in private investments for the construction of range improvements.").[17]  The FEIS also addressed the foreseeable impacts of the rule change on vegetation (FEIS at 4-31),

_____

[17]  BLM further explained that an operator's shared title "would not diminish the BLM's ability to manage or obtain access to public lands."  Addendum at 27.  This conclusion follows from the fact that the regulations continue to provide that a cooperative range improvement agreement conveys no right, title, or interest in any lands or resources held by the United States, and does not confer upon a cooperator or permittee the exclusive right to use a range improvement or the affected public lands.  Id.; see also 43 C.F.R. §§ 4120.3-1(e) and 4120.3-2(d).

economics (FEIS at 4-42), and social effects (FEIS at 4-48 and Table 4.3.14.1).  Given this documentation, Plaintiff has no basis to suggest that BLM ignored the change in its NEPA documentation.

Similarly, the BLM examined the impacts anticipated with the rule change that allows for joint ownership of water rights with permittees or lessees.  71 Fed. Reg. at 39,415.  BLM anticipates that the flexibility afforded will facilitate BLM's ability to administer grazing permits and leases in varied circumstances.  Id.  In instances where the water rights are held by permittees or lessees or are jointly owned with BLM, BLM has not seen evidence that these rights discourage cooperation or compliance with terms and conditions of grazing permits.  Id.

BLM examined the regulation change under NEPA and discussed its impact on grazing administration (FEIS at 4-28), vegetation (FEIS at 4-32), water resources (FEIS at 4-37) and social effects (FEIS at 4-49 and Table 4.3.14.1).  In addition, the BLM explained that permittee ownership of livestock water rights does not affect BLM's management discretion and authority over the public lands.  See Addendum at 41.  In fact, and as plaintiff fails to acknowledge, the existing grazing regulations do not preclude permittee ownership of livestock water rights.  The amended regulations are designed to promote administrative flexibility and efficiency, as well as cooperation with permittees, which is anticipated to result in fewer conflicts over water sources.  See Addendum at 40.  As BLM explained in the FEIS, "[b]y agreeing that permittees and lessees will hold livestock water rights, BLM may be able to negotiate better cooperative agreements, resulting in improved cooperation between the BLM, States, permittees, and lessees."  FEIS at 5-102; see also addendum at 42; Visser Decl. at ¶ 23.

### c.  BLM Adequately Considered Cumulative Impacts

Plaintiff argues that BLM failed to consider the cumulative impacts of the final rule. Pl. Br. at 22. As defined by the CEQ regulations, a cumulative impact is the "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . ." 40 C.F.R. § 1508.7.

Plaintiff contends that BLM's cumulative impact analysis fails to contain sufficient "quantified or detailed information" about present and future activities. Pl. Br. at 33. Plaintiff does not specify, however, which activities and associated impacts BLM's analysis should have taken into account. In fact, BLM's analysis identifies numerous other BLM initiatives on public lands. Addendum at 13-15 (including BLM's Sustaining Working Landscapes Policy Initiative, Healthy Forests Initiative and the National Fire Plan, the Vegetation Treatment EIS and BLM Sage-Grouse Habitat Strategy). See also FEIS at 4-60 – 4-62 (section of FEIS discussing cumulative and other effects). Given the discussion of cumulative impacts in the FEIS and Addendum, there is no basis for plaintiff's broad and unfounded assertion that the BLM failed to consider cumulative impacts in promulgating the new regulation.

The lack of merit to Plaintiff's claim is readily apparent from the one specific example it does present. Plaintiff contends that BLM failed to consider the cumulative impacts associated with a recent BLM proposal to add new categorical exclusions to its NEPA procedures that relate to grazing permit renewals and temporary non-renewable uses. Pl. Br. at 34. Plaintiff contends that this new proposal will cumulatively add to the exclusion of the public from BLM grazing decisions and that the BLM failed to consider this impact. Pl. Br. at 34. Not only does the Final Rule identify and discuss the categorical exclusion policy, 71 Fed. Reg. at 39,415, but by definition categorical exclusions cover categories of actions that do not have a significant impact

(either individually or cumulatively) on the environment.  40 C.F.R. § 1508.4.  Given the nature

of categorical exclusions, there can be no cumulative impact, either on the environment or on

public participation, that should be addressed in a FEIS.  See id. (no environmental assessment or

EIS required for categorically excluded actions).  For this very reason, courts have held that the

promulgation of a categorical exclusion does not require the preparation of an EIS.  Heartwood,

Inc. v. United States Forest Service, 73 F.Supp.2d 962 (S.D. Ill. 1999), aff'd, 230 F.3d 947 (7th

Cir. 2000).

     **C.**     **The Public Interest Weighs Against Issuing a Preliminary Injunction.**

Finally, the Court must consider the public interest in deciding whether to issue an

injunction against the regulations.  See Westlands Water Dist. v. Natural Res. Def. Council, 43

F.3d 457, 459 (9th Cir.1994) ("If the public interest is involved, the district court must also

determine whether the public interest favors the [plaintiffs]"); Preminger v. Principi, 422 F.3d

815, 826 (9th Cir. 2005).  BLM has broad discretion to administer the grazing program on public

lands and to issue regulations governing the program.  Public Lands Council, 529 U.S. at 742; 43

U.S.C. §§1701(a)((5), 1740.

Here, where plaintiff will not suffer irreparable injury and has not shown a likelihood of

success on the merits, the public interest weighs against issuing an injunction.  BLM has a strong

public interest in developing and using more effective and efficient regulations; state, tribal and

local governments have a strong public interest in being afforded greater consultation

opportunities; and the regulated community has a strong interest in having more clearly defined

regulations in place.  For all these reasons, the public interest weighs against issuing an

injunction.

**V.  CONCLUSION**

For the reasons expressed above, this Court should deny plaintiff's motions for a

preliminary injunction, and grant defendants' motion to dismiss Count III of the First Amended

Complaint.

Dated: July 24, 2006                         Respectfully submitted,

                                             SUE ELLEN WOOLDRIDGE
                                             Assistant Attorney General

                                             _____/s/_____
                                             Donna S. Fitzgerald, CT Bar No. 411810
                                             United States Department of Justice
                                             Environment & Natural Resources Division
                                             Natural Resources Section
                                             P.O. Box 663
                                             Washington D.C. 20044-0663
                                             Phone: 202-305-0476
                                             Fax: 202-305-0506

                                             JEAN WILLIAMS, Chief
                                             U.S. Department of Justice
                                             Environment & Natural Resources Division
                                             Wildlife & Marine Resources Section

                                             *S/ Courtney Taylor*
                                             _____
                                             COURTNEY TAYLOR, Trial Attorney,
                                             DC Bar # 475594
                                             U.S. Department of Justice
                                             Environment & Natural Resources Division
                                             Wildlife & Marine Resources Section
                                             Ben Franklin Station, P.O. Box 7369
                                             Washington, D.C. 20044-7369
                                             Telephone: (202) 353-7548
                                             Facsimile: (202) 305-0275
                                             courtney.taylor@usdoj.gov

Of Counsel:    Laura Brown
               Amy Sosin

Jean Sonneman
Office of the Solicitor
United States Department of the Interior
1849 C. St., N.W.
Washington D.C. 20240

Attorneys for Defendants