IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT,<br><br>      Plaintiff,<br><br>v.<br><br>JOE KRAAYENBRINK, et al.,<br><br>      Defendants. | Case No. CV-05-297-E-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it motions for injunction in two separate cases[1] raising the same issues. While the Court did not consolidate the cases, it did hold a joint hearing on the motions on July 28, 2006.[2] Following the hearing, the Court took the motions under advisement. For the reasons expressed below, the Court will grant in part the injunction motions, enjoining those new BLM regulations that

---

[1] The two cases are *WWP v. Kraayenbrink, Civ. No. 05-297-E-BLW* and *Maughn v. Rosenkrance*, *Civ. No. 06-275-E-BLW*. The Court will order that this decision be filed in both cases.

[2] There are other motions at issue, including a motion to dismiss the ESA claim. Because the Court did not need to address the ESA claim to resolve the injunction motions, and because of the emergency nature of the injunction motions, the Court will decide at a later time the remaining pending motions.

**Memorandum Decision and Order – Page 1**

govern public participation issues.

## FACTUAL BACKGROUND

This action challenges amendments to BLM grazing regulations that had last been subject to major revision in 1995. The BLM asserts that the changes were necessary to "improv[e] the working relationship with permittees and licensees and increas[e] administrative efficiency and effectiveness, including resolution of legal issues." *See Visser Declaration* at ¶ 6.

The plaintiffs (hereinafter collectively referred to as WWP) claim that the changes violate NEPA and FLPMA, and must therefore be enjoined. The BLM counters that the regulations are proper and should be allowed to take effect on August 11, 2006.

The BLM published a set of proposed regulations on December 8, 2003, and issued a draft EIS on January 2, 2004. The BLM completed a Final EIS (FEIS) in October of 2004, but did not release it to the public until June, 2005. Eight months later, on March 31, 2006, the BLM issued an Addendum to the FEIS, explaining that comments from the U.S. Fish and Wildlife Service, and others, had not been addressed in the FEIS. On July 12, 2006, the BLM issued its Final Rule and Record of Decision (ROD), adopting the proposed changes.

**1.    Changes to Public Participation**

**Memorandum Decision and Order – Page 2**

The Final Rule makes two major changes to the public participation process. First, the BLM modified the definition of "interested publics." Under the old definition, an individual or group that submitted a written request to the BLM to be involved in the decision-making process as to a specific allotment would be put on a list of "interested publics" and receive notice of issues arising concerning that allotment – including notice of day-to-day management issues. Under the new rule, the group would be dropped from that list if it received notice but did not comment.[3]

The second major change in public input comes from a narrowing of the BLM's duty to consult, cooperate, and coordinate (CCC) with the interested public. Under the old rules, the BLM's CCC duties ran to the interested public, the affected ranchers, and the state whenever the BLM issued, renewed, or modified a grazing permit for a certain allotment. The new rules no longer require the BLM to CCC with the interested public on the following decisions: (1) adjustments to allotment boundaries, *see* 43 C.F.R. § 4110.2-4; (2) changes in active use, *see* 43 C.F.R. § 4110.3-3(a); (3) emergency allotment closures, *see* 43 C.F.R. § 4110.3-3(b); (4) issuance or renewal of individual permits or leases, *see* 43 C.F.R.

---

[3] It is not clear to the Court whether the BLM will send notice to the dropped parties that they were dropped. The Final Rule does provide that the dropped parties can regain their status as interested parties.

**Memorandum Decision and Order – Page 3**

§ 4130.2(b); and (5) issuance of nonrenewable grazing permits and leases, *see* 43 C.F.R. § 4130.6-2.  For these matters, the interested public would be cut out of the discussions between the BLM and the ranchers at the formulation stage of decisions.

The BLM's CCC duties will continue to apply to longer-range decisions such as developing allotment management plans, range development planning and apportioning additional forage.  *See FEIS* at p. 4-28 (explaining that "[t]he proposed regulation would foster increased administrative efficiency by focusing the role of the interested public on planning decisions and reports that influence daily management, rather than on daily management decisions themselves").

Importantly, the new regulations effectively eliminate public oversight of temporary nonrenewable (TNR) permits.  Under the existing regulations, the BLM was required to consult with the interested public, *see* 43 C.F.R.§ 4130.6-2(a), and issue a proposed decision (that could be protested) before issuing the TNR.  *See* 43 C.F.R. §§ 4160.1, 4160.2.  Under the new regulations, the TNR permits will go into effect immediately without notice or consultation with members of the public.

Ken Visser, the BLM's "national expert on public lands grazing administration," *see Visser Declaration* at p. 2, ¶ 3, concludes that "[a]fter August 11, 2006, WWP will receive no notices with respect to day-to-day management

**Memorandum Decision and Order – Page 4**

such as designating and adjusting allotment boundaries or modifying a grazing permit or lease . . . ." *Id.* at p. 9, ¶ 12.  During oral argument, the BLM's counsel explained that Visser's statement is inaccurate because WWP would receive proposed decisions from the BLM so long as WWP remained on the list of "interested publics."  Counsel cited 43 C.F.R. § 4160.1 in correcting Visser.

This would not apply to TNR permits because no proposed decision will be provided to the interested public.  Otherwise, counsel is correct, but her correction only addresses part of Visser's interpretation.  While WWP will receive proposed decisions, it will not receive notice – or be consulted – prior to the issuance of a proposed decision on those day-to-day management issues listed above.  To the extent Visser was commenting on public input *prior to the issuance of a proposed decision*, his interpretation is correct, and that portion of his testimony was not addressed by the BLM's counsel.  Moreover, even after issuing a proposed decision to WWP, the BLM has no CCC duty running to WWP (with regard to the day-to-day management decisions listed above) as it had under the old regulations.

The new public input provisions will have a substantial impact on WWP.  WWP has "interested publics" status on hundreds of BLM allotments encompassing at least 50 million acres of public lands in Idaho, Nevada, Utah and

other states.  *See, e.g., Declaration of Marvel* at ¶¶ 6-7.[4]  Given its wide involvement, WWP cannot respond to every BLM notice, and its failure to respond would result in it being dropped from the notice list for each corresponding allotment.  Moreover, the BLM's CCC duties would no longer apply to WWP for those day-to-day decisions listed above and the issuance of TNR permits.

**2.     Changes to Fundamentals of Rangeland Health**

The Final Rule changes the BLM's reliance on the Fundamentals of Rangeland Health (FRH) criteria in three ways.  First, the BLM need not rely on the FRH at all if state-specific Standards and Guidelines are in place.  Second, the BLM may no longer rely on "all available data" in determining whether Standards and Guidelines are being violated but is required to use only multi-year monitoring data.  Third, the BLM is no longer required to take immediate action upon finding violations but may instead take 24 months to adopt a new grazing decision and then take an additional year to implement that decision.

**3.     Changes to Range Improvement Ownership**

The Final Rule amends 43 C.F.R. § 4120.3-2 to allow shared title of permanent range improvements constructed under cooperative range improvements

---

[4] A similar situation exists in *Maughn* case with regard to plaintiff Idaho Conservation League.  *See Kincannon Declaration.*

**Memorandum Decision and Order – Page 6**

agreements. Title would be shared in proportion to the permittee's and Government's contributions to the on-the-ground project development and construction costs.

**4.      Effective Date of Changes**

The new regulations take effect on August 11, 2006.

## ANALYSIS

**1.      Ripeness**

The BLM argues that WWP's challenge is not ripe for review because it authorizes no action "on the ground." The BLM asserts that litigation must wait until the BLM takes action under the new regulations and there is a concrete decision to review.

The Ninth Circuit has addressed these issues in a decision issued yesterday, *Earth Island Institute v. Ruthenbeck*, 2006 WL 2291168 (9th Cir. Aug. 10, 2006). There, the Forest Service published new regulations revising the notice, comment, and appeal procedures for certain forest projects. Plaintiffs brought suit claiming the regulations were inconsistent with the governing statute, the Forest Service Decision Making and Appeals Reform Act (ARA).

The district court held that the challenge was ripe because the regulations were final and it would in inefficient to require plaintiffs to wait for discrete Forest

**Memorandum Decision and Order – Page 7**

Service decisions under the regulations and then file "multiple lawsuits in multiple jurisdictions . . . ." *Earth Island Institute v. Pengilly*, 376 F.Supp. 2d 994, 1002 (E.D.Cal. 2005).

The Ninth Circuit reversed in large part, finding that the only ripe claim was one where the Forest Service had cut off an appeal right on a specific salvage timber sale known as the Burnt Ridge Project. *Earth Island*, 2006 WL at *6. As to the other claims, the Circuit found that "[t]he record is speculative and incomplete," and that plaintiff had failed to show "the sort of injury that would require immediate review of the remaining regulations." *Id.*

*Earth Island* is distinguishable in part from the present case. With regard to WWP's challenge to the new rules governing public participation, the record is complete and those rules do inflict the "sort of injury that would require immediate review." *Id.*

WWP is challenging an agency decision based on a allegedly flawed process. The process is complete and the agency has made its decision based on that process. WWP's claim, therefore, is ready to be resolved. Nothing more could be gained from further factual development.

The Court recognizes, however, that *Earth Island* may require more, and there is more here. Requiring the public to wait for discrete BLM decisions under

**Memorandum Decision and Order – Page 8**

the new regulations places upon them a substantial burden since those very regulations could mean they get no notice of those decisions. The burden is especially severe with regard to TNR permits because the public will not be consulted and will receive no proposed decision.

This is a special injury warranting immediate examination. Nothing akin to it was present in *Earth Island*. Indeed, as quoted above, the Circuit found there that plaintiffs had not shown "the sort of injury that would require immediate review . . . ." *Id*. at *6. Here, WWP has shown a unique injury from the barriers to public participation that would make it difficult to pursue challenges to discrete BLM decisions.

For these reasons, the Court finds *Earth Island* distinguishable as to the public participation issues. WWP's challenges to the new rules on public participation are fit for resolution, and the Court would cause substantial hardship to WWP by withholding consideration. *Natural Resources Defense Council v. Abraham*, 388 F.3d 701, 705 (9th 2004). The Court therefore finds the public participation claims ripe for resolution.

WWP has also challenged the new regulations changing the rules concerning the FRH and the ownership of range improvements. *Earth Island* may be applicable to those two issues, although the Court makes no final ruling in that

**Memorandum Decision and Order – Page 9**

regard. The Court merely finds that *Earth Island's* apparent applicability precludes an injunction at this time as to the FRH and range improvement changes.

The Court recognizes that the parties have not had an opportunity to brief *Earth Island*. The Court emphasizes that its decisions here are preliminary in nature and subject to change after receiving further argument and briefing from counsel on the applicability of *Earth Island's* ripeness analysis to the issues presented here.

## 2.     Injunction Standard

A plaintiff may obtain a preliminary injunction by showing "(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest." *Earth Island Institute v. United States Forest Service*, 442 F.3d 1147, 1158 (9th Cir. 2006). Alternatively, a court may grant a preliminary injunction if a plaintiff "demonstrates either a combination of probable success on the merits and the possibility of irreparable harm or that serious questions are raised and the balance of hardships tips sharply in his favor." *Id*.

## 2.     NEPA Legal Standards

To determine the strength of WWP's case on the merits – a necessary

finding in the injunction test set forth above – the Court must identify the legal standards governing NEPA claims. The Court's review is governed by the Administrative Procedures Act (APA). *See Native Ecosystems Council v. United States*, 418 F.3d 953, 961 (9th Cir. 2005). Under the APA, the Court may set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Although this standard is a "narrow one," the Court is required to "engage in a substantial inquiry[,] . . . a thorough, probing, in-depth review." *Native Ecosystems*, 418 F.3d at 961. To have not acted in an arbitrary and capricious manner, the agency must present a "rational connection between the facts found and the conclusions made." *Id*. More specifically to this case, "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *Motor Vehicle Manufacturers Assoc. v. State Farm*, 463 U.S. 29, 42 (1983).

In reviewing the adequacy of an Environmental Impact Statement (EIS) under NEPA, the Court applies the "rule of reason" standard, which "requires a pragmatic judgment whether the EIS's form, content, and preparation foster both informed decision-making and informed public participation." *Id*. at 961. The Court must ensure that the agency has taken a "hard look" at the potential

**Memorandum Decision and Order – Page 11**

environmental consequences of the proposed action.  *Id.*

### 3.     NEPA & Public Participation Changes

Applying these standards to this case, NEPA requires that the BLM take a hard look in the FEIS as to why public participation and CCC duties should be more limited than those in the 1995 regulations.  The Court needs first to determine WWP's chance of success on this issue.

One reason advanced by the BLM for this change involves the cost of maintaining a list of "interested publics" that must get "periodic mailings at taxpayer expense" but have not "participated . . . in years."  *See FEIS* at p. 5-95.  The BLM does not list the specific costs it incurs, beyond noting that it has incurred "substantial expenses" in supporting public participation generally and that '[s]ome of these resources have been devoted to tasks such as maintaining lists" of persons that have not participated in years.  *Id.*

It is impossible to evaluate this claim without knowing the specific costs involved.  The cost of "maintaining" a list is not apparent.  Certainly there is a cost for mailing notices to the "interested publics" but the FEIS does not discuss the number, bulk, or frequency of mailings.  Indeed, at another section of the FEIS, the BLM contradicts itself by asserting that the "modification of the definition [of interested publics] would result in some *minor* administrative cost savings

associated with maintaining the interested public mail list and in mailing costs." *See FEIS* at p. 4-27 (emphasis added).

This contradictory and vague discussion of costs in the FEIS prevents the public and Court from evaluating the BLM's claim that the new regulations will save costs. This compels the Court to conclude that WWP has a strong chance of prevailing on its argument that the BLM's cost rationale was not sufficiently discussed in the FEIS.

The BLM has advanced other reasons for the changes, including the following:

> BLM believes that in-depth involvement of the public in day-to-day management decisions is neither warranted nor administratively efficient and can in fact delay BLM remedial response actions necessitated by resource conditions. Day-to-day management decisions implement land use planning decisions in which the public has already had full opportunity to participate. Also, such in-depth public involvement can delay routine management responses, such as minor adjustments in livestock numbers or use periods to respond to dynamic on-the-ground conditions. Cooperation with permittees and lessees, on the other hand, usually results in more expeditious steps to address resource conditions and can help avoid lengthy administrative appeals.

*See FEIS* at pp. 5-24 to 5-25.

Public participation is, by nature, messy. To manage it, agencies must be "given ample latitude to adapt their rules and policies to changed circumstances." *Motor Vehicle Mfgs.*, 463 U.S. at 42. At the same time, the agency's management

**Memorandum Decision and Order – Page 13**

of public input cannot defeat NEPA's purpose of "ensuring that the agency will have . . . detailed information concerning significant environmental impacts, and . . . that the public can . . . contribute to that body of information . . . ." *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Commission*, 449 F.3d 1016, 1034 (9th Cir. 2006). The BLM itself recognized this when proposing the 1995 regulations: "Experience has shown that the greater and more meaningful the participation during the formulation of decisions and strategies for management, the higher the level of acceptance and thus the lower the likelihood of a protest, an appeal, or some other form of contest." *See* 60 Fed.Reg. 9894, 9924 (1995).

The FEIS concludes that the changed rules on public input will have only a minimal effect on public input. However, a group like WWP that monitors hundreds of allotments will now have to comment on every management issue or risk losing its status as an "interested public." Such groups will either have to monitor fewer allotments, thereby reducing the information transmitted to the BLM, or comment indiscriminately at every opportunity, diluting the value of their input.

Either way, the changes would appear to substantially affect both the amount and quality of public input. The FEIS reasons that groups like WWP will still receive notice of proposed decisions and can file protests and appeals. *See*

**Memorandum Decision and Order – Page 14**

*Addendum* at p. 53.  However, a proposed decision carries with it an inevitable momentum favoring that result, an effect NEPA seeks to avoid by "ensur[ing] that federal agencies are informed of environmental consequences *before making decisions . . . .*"  *Citizens for Better Forestry v. United States*, 341 F.3d 961, 970 (9th Cir. 2003) (quotations omitted).  Thus, getting notice of a proposed decision does not mitigate the harm of being precluded from the formulation process.

Moreover, the interested public will not receive proposed TNR permit decisions under the new regulations – the TNRs could be issued immediately.  In the past, the BLM has often used TNR permits to increase grazing levels above prior limits.  *See WWP v. Bennett*, 392 F.Supp.2d 1217 (D. Id. 2005).  Thus, this is no obscure change – it will freeze the public out of the formulation of TNR permits, a process the BLM has used frequently to increase grazing.

The FEIS also reasons that groups like WWP will still be able to participate in the preparation of Allotment Management Plans (AMPs).  *See FEIS* at p. 4-28.  The record here – and the Court's experience in other cases – shows that many allotments lack AMPs, and that the AMP preparation process is very slow.  *See Visser Declaration* at § 10 (AMPs cover only about half of the allotment acreage, with coverage increasing only slightly in the last 15 years).

NEPA's "hard look" requires "a discussion of adverse impacts that does not

**Memorandum Decision and Order – Page 15**

improperly minimize negative side effects." *Earth Island*, 442 F.3d at 1159. WWP has a strong argument that the FEIS minimized the detrimental effects that the new regulations would have on public input.

Moreover, WWP has a strong argument that the FEIS does not explain how the limitations on public input will increase efficiency. NEPA values public input without distinguishing whether it involves day-to-day issues or longer-range issues. Because both are valued, neither can be jettisoned simply to reduce the agency's work load. The BLM offers no legal authority that public input on day-to-day issues is inherently less valuable and subject to less protection than public input on long-range issues.

Thus, the FEIS cannot rely on presumptions but must affirmatively show how cutting back public input on day-to-day issues will improve efficiency. No such analysis is contained in the FEIS. There is no detailed discussion of either the volume or quality of comments the BLM receives on day-to-day issues. Is the volume overwhelming? Are the comments mostly specious? What are the costs and employee resources involved? These questions are not addressed in the FEIS.

When "the information in the . . . EIS [is] so incomplete . . . that the . . . public could not make an informed comparison of the alternatives, revision of the EIS may be necessary . . . ." *Ecology Center, Inc. v. Austin*, 430 F.3d 1057, 1067

**Memorandum Decision and Order – Page 16**

(9th Cir. 2005). In this case, WWP has a strong argument that the FEIS does not contain enough information to make an informed evaluation of the BLM's claim that efficiency compels these changes.

While the analysis of WWP's chance of success has proceeded to this point under NEPA, the same analysis can be made under the Federal Land Policy and Management Act (FLPMA). Public input has the same elevated role in FLPMA that it has under NEPA. FLPMA requires the BLM to give "the public adequate notice and an opportunity to comment upon the formulation of standards and criteria for, and to participate in, the preparation and execution of plans and programs for, and the management of, the public lands." *See* 43 U.S.C. § 1739(e).

This statutory language values public input on long-range issues ("preparation of plans and programs") as well as on day-to-day issues ("the management of" and "execution of" those long-range plans). This same language promotes early public participation at the "formulation" stage, before the decision is made. The changes made by the BLM appear to violate these FLPMA provisions.

To summarize, the Court finds that WWP has a strong argument that the FEIS violates NEPA and FLPMA by (1) improperly minimizing the detrimental effects of the changes on public input, and (2) failing to contain information from

**Memorandum Decision and Order – Page 17**

which the Court and public could evaluate the limitations on public input contained in the new regulations.

Moreover, WWP has shown the necessary possibility of irreparable harm. The public input of groups like WWP will be limited, as discussed above, and irreparable harm could result from the BLM making decision without the full public input mandated by NEPA.

These circumstances show that the balance of hardships tips favors WWP. The record reveals no need to quickly limit public input.

Finally, the public interest is advanced by enjoining limits on public input. For all of these reasons, the Court will enjoin those new BLM regulations governing public participation.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the Motion for Injunction re NEPA Violations (docket no. 25) is GRANTED IN PART and the new BLM regulations changing the rules on public participation are hereby ENJOINED.  Those regulations include 43 C.F.R. §§ 4100.0-5, 4110.2-4, 4110.3-3, 4130.2, 4130.3-3, and 4130.6-2.  The motion is denied in all other respects.

IT IS FURTHER ORDERED, that this preliminary injunction shall last until

the Court can hear the parties in any further proceeding.

IT IS FURTHER ORDERED, that counsel are directed to contact the Court's Clerk, LaDonna Garcia (208-334-9021) to schedule further matters in this case.

DATED:  **August 11, 2006**

B. LYNN WINMILL
Chief Judge
United States District Court

**Memorandum Decision and Order – Page 19**